**John CARTER, John Swing and John Veronis, Plaintiffs,**

v.

**HELMSLEY–SPEAR, INC. and 474431 Associates, Defendants.**

No. 94 Civ. 2922 (DNE).

United States District Court, S.D. New York.

May 18, 1994.

---

Richard A. Altman, New York City, for plaintiffs.

Davidoff & Malito, New York City (Matthew Feigenbaum, Robert C. Boneberg, Adrian Zuckerman, Jill Rosenthal, John Harris, of counsel), for defendants.

## OPINION & ORDER

EDELSTEIN, District Judge:

Plaintiffs bring this action pursuant to the Visual Artists Rights Act of 1990, 17 U.S.C. § 101 *et seq.* ("VARA"). Plaintiffs' complaint also raises several supplemental state law claims. On or around April 21, 1994, plaintiffs brought an order to show cause seeking a temporary restraining order to, among other things, prevent defendants from taking any action to alter, deface, modify, or muti-

late plaintiffs' sculptures and installations located at 47–44 31st Street, Queens, New York.

On April 25, 1994, this Court, sitting in Part 1, heard argument from both plaintiffs and defendants regarding plaintiffs' application for a temporary restraining order.[1] On April 26, 1994, this Court issued a temporary restraining order enjoining defendants from (a) taking any action to alter, deface, modify, or mutilate plaintiffs' sculptures and installations located at 47–44 31st Street, Queens, New York; and (b) denying plaintiffs access to [47–44 31st Street, Queens, New York] Monday through Friday, from 12:00 p.m. to 5:00 p.m.[2]

On May 5, 1994, this Court commenced a hearing ("the hearing") on plaintiffs' motion for a preliminary injunction ("Plaintiffs' Motion") pursuant to Federal Rule of Civil Procedure ("Rule") 65. Plaintiffs' Motion seeks an order enjoining defendants, during the pendency of this action, from "(a) taking any action to alter, deface, modify or mutilate plaintiffs' sculptures and installation located at 47–44 31st Street, Queens, New York [hereinafter "plaintiffs' first request for relief"]; (b) taking any action to breach the agreements heretofore entered into between plaintiffs, Sig Management Company and 47–44 31st Association, L.P. [hereinafter "plaintiffs' second request for relief"]; and (c) denying plaintiffs, their employees and invitees such access to the Property as had been enjoyed by them heretofore [hereinafter "plaintiffs' third request for relief"]."

In the course of the hearing, which commenced on May 5, 1994 and continued through May 13, 1994, this Court heard oral argument and received documentary evidence on Plaintiffs' Motion. In addition, plaintiffs and defendants called both expert and fact witnesses. The findings contained herein are based on the testimony, evidence, and arguments presented at the hearing and on the parties' moving and opposition papers.

For the reasons discussed below, Plaintiffs' Motion is granted in part and denied in part.

## BACKGROUND

Plaintiff John Meade Swing is a sculptor and an artist who has held public exhibits of his original works of art since 1984. (Tr.[3], at 18–19). Mr. Swing is also licensed by the City of New York as a structural steel welder. (Tr., at 21). Plaintiff John James Veronis, Jr. is an artist and a sculptor who supports himself through his artistic endeavors. (Tr., at 30). Plaintiff John Francis Carter also is an artist and sculptor. (Tr., at 37, 39). Plaintiffs work as partners to create sculptures and other works of visual art. Collectively, plaintiffs are known as the "Three–Js," or "J × 3." (Tr., 60).

By an agreement dated December 16, 1991 ("the Contract"), plaintiffs contracted with Sig Management Company ("Sig") "to design, create and install sculpture and other permanent installations" in the lobby of a building located at 47–44 31st Street, Queens, New York ("the Lobby"). (Ps–Ex.[4] 1). Under the terms of the Contract, Sig granted plaintiffs "full authority in design, color and style" of the art work to be installed, but retained the authority to direct the location of the installations. The Contract provides that plaintiffs are entitled to "receive design credit" for their sculptures and installations ("the Work") and own the copyright to the Work. Sig was to receive fifty percent of any proceeds earned from the exploitation of this copyright. On or around January 20, 1993, Sig and plaintiffs signed an agreement ("Extension Contract") that extended the duration of Contract, without material alteration, for an additional year. (Ps–Ex. 2). Un-

---

1. This case originally was assigned to the Honorable Allen G. Schwartz. Judge Schwartz recused himself from this matter before hearing argument on plaintiffs' order to show cause.

2. On April 27, 1994, this Court received cross-requests from plaintiffs and defendants to modify the temporary restraining order issued by this Court on April 26, 1994. In a Memorandum & Order, dated April 28, 1994, this Court denied both plaintiffs' and defendants' requests for modification. *See Carter v. Helmsley–Spear, Inc.,* 94 Civ. 2922 (DNE), 1994 WL 167960, 1994 U.S.Dist. LEXIS 5581 (S.D.N.Y. April 28, 1994).

3. "Tr.," refers to the hearing transcript.

4. "Ps–Ex." refers to plaintiffs' hearing exhibit. "Ds–Ex." refers to defendants' hearing exhibit.

til April of this year, the terms of these agreements were adhered to by plaintiffs, Sig, and successor partnerships that held the net lease to 47–44 31st Street, Queens, New York ("the Property").

From December 1991 until July or August 1993, plaintiffs were each paid $1,000 weekly by Sig Management. (Tr., at 27). From July or August 1993, until about April 6, 1994, plaintiffs were paid $1,000 weekly by a successor partnership to Sig. (Tr., at 28). Throughout this period, plaintiffs worked continually on the Work. (Tr., at 34).

## DISCUSSION

■ It is well settled in this Circuit that, in order to be entitled to a preliminary injunction, the moving party must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the movant. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979); *see JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990) (*per curiam*). "Irreparable injury is one that cannot be addressed through a monetary award. Where money damages are adequate compensation a preliminary injunction should not issue." *JSG Trading Corp.,* 917 F.2d at 79; *see Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 974–75 (2d Cir. 1989). Irreparable harm, however, generally is presumed in the copyright context when the movant establishes a *prima facie* case of copyright infringement. *See, e.g., Bourne Co. v. Tower Records, Inc.,* 976 F.2d 99, 101 (2d Cir.1992); *Video Trip Corp. v. Lightning Video, Inc.,* 866 F.2d 50, 51–52 (2d Cir.1989).

The keystone of plaintiffs' claims is the Visual Artists Rights Act of 1990, 17 U.S.C. § 101 *et seq.* Title 17, United States Code, section 106A(a)(3) provides that the author of a work of visual art,

subject to the limitations set forth in section 113(d), shall have the right—

(A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any in-

tentional distortion, mutilation, or modification of that work is a violation of that right, and

(B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

A "work of visual art" is defined to include paintings, drawings, prints, and sculptures, existing in a single copy or in a limited edition. 17 U.S.C. § 101. Works made for hire are specifically excluded from this definition. *Id.* The rights delineated in section 106A(a)(3) subsist for the life of the last surviving author of a work created by more than one artist. 17 U.S.C. § 106A(d)(3).

The "limitations set forth in section 113(d)," which are referenced in section 106A(a)(3), are as follows:

(d)(1) In a case in which—

(A) a work of visual art has been incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3), and

(B) the author consented to the installation of the work in the building either before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, or in a written instrument executed on or after such effective date that is signed by the owner of the building and the author and that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its removal,

then the rights conferred by paragraphs (2) and (3) of section 106A(a) shall not apply.

(2) If the owner of a building wishes to remove a work of visual art which is a part of such building and which can be removed from the building without the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3), the author's rights under para-

graphs (2) and (3) of section 106A(a) shall apply unless—

(A) the owner has made a diligent, good faith attempt without success to notify the author of the owner's intended action affecting the work of visual art, or

(B) the owner did provide such notice in writing and the person so notified failed, within 90 days after receiving such notice, either to remove the work or to pay for its removal.

1. *PLAINTIFFS HAVE SHOWN THAT THEY WILL SUFFER IRREPARABLE HARM IF THE WORK IS ALTERED, DEFACED, MODIFIED, OR MUTILATED DURING THE PENDENCY OF THIS ACTION OR IF PLAINTIFFS AND THEIR INVITEES ARE DENIED ACCESS TO THE LOBBY*

■ In order to be entitled to preliminary injunctive relief, plaintiffs first must show that they will suffer irreparable harm if a preliminary injunction is not granted. Irreparable harm generally is presumed in the copyright context when the movant establishes a *prima facie* case of copyright infringement. *See, e.g., Bourne Co.*, 976 F.2d at 101; *Video Trip Corp.*, 866 F.2d at 51–52. VARA is an amendment to Title 17, the United States Copyright Act. Plaintiffs have demonstrated that, by contract, they own the copyright to the Work. Defendants have stated their intention to remove or materially alter the Work. As such, plaintiffs are, arguably, entitled to the presumption of irreparable harm generally available in cases of copyright infringement.

■ Even assuming, *arguendo*, that the presumption of irreparable harm does not apply to claims brought pursuant to VARA, plaintiffs have established that they will suffer irreparable harm absent preliminary injunctive relief as to their first and third requests for relief. As to plaintiffs' first request for relief, I find that plaintiffs would be irreparably harmed if the Work is altered, defaced, modified, or mutilated during the pendency of this action. VARA grants artists certain rights known as "*droit moral,*" or moral rights. The concept of *droit moral*

embodied in VARA is, by definition, not an economic right. *See* William F. Patry, *Copyright Law and Practice,* Ch. 14, at 1021 (These rights "are intended to supplement the economic interests that form the basis of the Section 106 rights by protecting the author's personal association with his or her work."). Plaintiffs, therefore, could not be made whole by an award of money damages. In light of defendants' stated intention to dismantle the Work, plaintiffs have demonstrated that they will suffer irreparable harm absent injunctive relief; once the Work is destroyed, this Court could not effectively reverse that action. Stated another way, if the Work is altered or destroyed during the pendency of this action, and if plaintiffs ultimately prevail on the merits of their suit, this Court would be left without the power to remedy the violation of plaintiffs' rights. Thus, plaintiffs have demonstrated that they will be irreparably harmed absent preservation of the status quo.

As to plaintiffs' third request for relief, plaintiffs have shown that they will be irreparably injured if they and their invitees are denied access to the Lobby during the pendency of this suit for the purposes of (1) observing, viewing, or showing the Work, or (2) photographing or videotaping the Work.

Plaintiffs will be irreparably harmed absent preliminary injunctive relief in this regard for several reasons. First, it is undisputed that plaintiffs and their invitees had unrestricted access to the Property prior to the events that gave rise to this suit and that plaintiffs own the copyright to the Work. Thus, plaintiffs will be irreparably harmed absent such access because they will be unable to protect, or prevent the exploitation or infringement of, their copyright in the Work. Second, permitting plaintiffs and their invitees access to the Lobby during the pendency of this suit is necessary to ensure that the Work is not altered, defaced, modified, or mutilated. If access is denied, it would be impossible for plaintiffs timely to notify the Court should defendants or their agents take actions that would adversely impact the Work. Third, plaintiffs and their invitees must have access to the Work in order to prepare adequately for a trial on the merits

of their claims. In order to prove their claims, it will be necessary for plaintiffs to present expert testimony on the issues raised in their complaint. If plaintiffs, or their invitees, are denied access to the Property during the pendency of this suit, plaintiffs' ability to prepare for trial will be impaired.

■ I find, however, that plaintiffs will not suffer irreparable harm absent preliminary injunctive relief on their second request for relief. Simply stated, plaintiffs request that this Court enjoin defendants from breaching contracts between plaintiffs and Sig. This request clearly falls outside the purview of Rule 65.

## 2. PLAINTIFFS HAVE RAISED SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS TO MAKE THEM A FAIR GROUND FOR LITIGATION AND HAVE SHOWN THAT THE BALANCE OF HARDSHIPS TIPS DECIDEDLY TOWARD PLAINTIFFS

### I. Plaintiffs Have Shown That Sufficiently Serious Questions Going to the Merits of Their Claims Exist to Make Them a Fair Ground For Litigation

Having made a showing of irreparable harm, plaintiffs must next show either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward plaintiffs. I find that, at the very least, plaintiffs have demonstrated the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation. Furthermore, plaintiffs have also demonstrated that the balance of hardships tips decidedly in their favor.

### a. Is the Work a work of visual art?

Plaintiffs have made a strong showing that the Work is a "work of visual art" as defined in 17 U.S.C. § 101. It is undisputed that the Work is a sculpture existing in a single copy. Defendants, however, contend that the Work is a "work made for hire." Based on this contention, defendants argue that the Work is not a "work of visual art" because 17 U.S.C. § 101 defines works made for hire as not being "works of visual art."

As relevant here, 17 U.S.C. § 101 defines a "work made for hire" as

(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplemental work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

It is undisputed that the second part of the definition quoted above does not apply to this case. Accordingly, defendants' argument raises the question of whether plaintiffs were employees of the entities that commissioned the Work and, if they were, whether the Work was prepared within the scope of their employment.

■ In *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), the Supreme Court enumerated factors relevant to the consideration of whether a hired party who creates a copyrightable work is an "employee" for purposes of evaluating whether a given work is a "work made for hire." In order to determine whether a hired party is an employee, courts consider "the hiring party's right to control the manner and means by which the product is accomplished." *Community for Creative Non–Violence*, 490 U.S. at 751, 109 S.Ct. at 2178. Factors relevant to this inquiry include

the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and

the tax treatment of the hired party. No one of these factors is determinative.

*Id.* at 751–52, 109 S.Ct. at 2178–79 (footnotes and citations omitted).

At the hearing, defendants elicited testimony in support of their contention that plaintiffs were employees of Sig and the successor partnerships (collectively "the Partnerships") which commissioned the Work. This testimony established that the Partnerships provided plaintiffs with some tools, required that plaintiffs work on the Work for a minimum number of hours weekly, paid plaintiffs via a weekly check, paid some of plaintiffs' assistants, provided plaintiffs with some health insurance benefits for a portion of the time they worked on the Work, and withheld taxes from weekly checks issued to plaintiffs.

Other testimony and evidence, however, strongly supports plaintiffs' contention that they were not employees of the Partnerships. As an initial matter, the Partnerships did not have the right to dictate the shape or style that the Work would take. Under the terms of the Contract, plaintiffs had "full authority in design, color and style" with regard to the Work. (Ps–Ex. 1). The only limitation that was apparently placed upon them was that, with regard to location, the Work had to be located within the Lobby. For example, Mr. Veronis testified that, pursuant to the Contract and the Extension Contract, it was his understanding that the artists were to "make sculptures and install them in the lobby of the building. And it was our decision as to what these sculptures might look like and might appear to be. And we were at liberties to create them and put them up throughout the lobby area of the building." (Tr., at 33). At the time they were retained by Sig Management, plaintiffs understood that they were being retained to design a lobby which would be a "museum" of their original art work. (Tr., 21, 39–40). Theodore D. Nearing, who was in charge of Property-related issues on behalf of Corporate Life Insurance Company, which held a 49.9% limited partnership interest in the net lease to the Property, testified that neither he, nor Corporate Life Insurance Company, had any input with respect to the design or placement of the art work in the lobby. (Tr., 195). Mr. Nearing further testified that, to the best of his knowledge, Sig also did not have any input with respect to the design or placement of the art work in the lobby. (Tr., 195).

Thus, evidence and testimony proffered at the hearing tended to show that the Partnerships allowed plaintiffs full discretion to design and place their works within Lobby. (Tr., 195). Plaintiffs apparently had complete artistic freedom to create the Work, and were not given any artistic direction by the Partnerships. This unfettered artistic freedom is uncharacteristic of an employer-employee relationship.

Furthermore, other evidence strongly supports plaintiffs' contention that they were not employees and that the Work was not a work made for hire. Plaintiffs are artists and sculptors which, as numerous courts have recognized, are highly skilled occupations. *See, e.g., Community for Creative Non–Violence,* 490 U.S. at 752, 109 S.Ct. at 2179. Plaintiffs used many of their own tools to create the Work. Plaintiffs were not prior employees of the Partnerships, nor would they be employed by the Partnerships upon completion of the Work. The Partnerships were not entitled to assign other projects to plaintiffs. The Partnerships were not in the business of creating, marketing, or exploiting works of art or sculpture. Although the Partnerships required plaintiffs to work a minimum number of hours weekly on the Work, plaintiffs were permitted to work additional hours, had unfettered 24–hour access to the Property, and often worked far in excess of the minimum number of hours contractually required of them. The project completion date was open-ended: The Partnerships set no deadline for the completion of the Work. Rather, plaintiffs apparently were hired with the understanding that the project would terminate when plaintiffs had transformed the Lobby into a "museum" of their art work. Plaintiffs employed unpaid assistants. Plaintiffs worked for a period of time without any insurance benefits. Plaintiffs supplied and incorporated into the Work thousands of dollars worth of raw material for which they never sought or received reimbursement. (Tr., at 458).

Moreover, by contract, plaintiffs own the copyright to the Work. (Ps–Ex. 1). This is particularly relevant in this context because in the traditional employer-employee relationship—which leads to the creation of a work made for hire—the employer rather than the employee owns the copyright. At the hearing, it was shown that plaintiffs may exploit the copyright in the Work for economic gain.

Finally, the Work is signed by plaintiffs, the "Three–Js." It does not bear a corporate logo, trademark, or company name. The only appellation incorporated in the Work is plaintiffs' communal signature. In the context of works made for hire, by contrast, the resulting art work is normally attributed to the employer.

Thus, while some evidence supports defendants' contention that plaintiffs were employees of the Partnerships, considerable evidence supports plaintiffs' contention that they were not. Based on the evidence in the record, I find that plaintiffs have made a strong showing that the Work is not a work made for hire. At a minimum, plaintiffs clearly have raised a sufficiently serious question going to the merits of their claims.

*b. Is the Work installed in a building such that it cannot be removed without destroying the Work?*

At the hearing, plaintiffs offered evidence and testimony to show that the Work consists of a number of sculptural elements that form a single sculpture. Plaintiffs also proffered evidence and testimony to show that the Work is permanently incorporated in the Property and cannot be removed without destruction of the Work.

The Work, in its current state of progress, is composed of several sculptural and other visual elements that appear to form an integrated whole. (Tr., at 52–83; Ps–Ex. 7, 8–31). For example, tile is attached to the floor and walls to form a vast mosaic. This mosaic is interrelated with sculptural elements that adorn the floor, walls, and ceiling of the Lobby. (*See, e.g.,* Tr., at 55, 63, 79; Ps–Ex. 7, 23). The mosaic contains words and phrases that correspond to sculptural elements located on the ceiling and walls. (*See, e.g.,* Tr., at 57; Ps–Ex. 7). Several

interactive pieces depend for their meaning on neighboring sculptures, as well as on phrases and representations depicted in the mosaic tile. (*See, e.g.,* Tr., at 57–8; 62–64). In sum, the various sculptural elements appear to be interrelated—rather than distinct art works that could be separated from each other without losing their meaning.

A description of one portion of the Lobby provides an apt illustration. The front of a dollar bill is depicted in the floor mosaic. On the ceiling, the back of a dollar bill is depicted facing down toward the floor. Text incorporated in the floor mosaic indicates the meaning of the dollar bill as a symbol in relation to an adjacent sculptural element. The sculptural element depicts the disposal of toxic waste and other refuse into the ocean. A mythological god, Neptune, presides over this scene. The images of the front and back of a dollar bill, the text in the mosaic, and related sculptural elements, together depict the destruction of the world's oceans as a result of man's greed. (Tr., at 58–59; Ps–Ex. 7, 8).

With regard to the entire Work, Mr. Carter testified that "all of these pieces are interrelated and to remove one contaminates the meaning of the whole piece. It would be like removing part of a painting or the hands from a portrait because we consider this to be one work." (Tr., at 60). Defendants did not offer evidence or testimony to rebut Mr. Carter's conclusions in this regard.

Plaintiffs also showed that portions of the Work cannot be removed without their destruction. The floor mosaic, composed of more than 800,000 recycled glass tiles, is permanently attached to the floor. (Tr., at 62; Ps–Ex. 7, 9, 13). Other tiles are affixed to the walls. (Ps–Ex. 7, 13). Removal of these tiles could only be accomplished by chiseling them off of the floor or walls—a process that would result in their destruction. (Tr., at 62).

I find that plaintiffs have made a strong showing that the Work is "incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work." 17

U.S.C. § 113(d)(1)(A). Hence, plaintiffs have, at the very least, raised a serious question going to the merits of their claims, regarding whether the Work is entitled to protection as a work of visual art installed in a building that cannot be removed without its destruction. *See* 17 U.S.C. § 113(d)(1)(A).

c. *Is the Work "a work of recognized stature" and would its destruction be "prejudicial" to plaintiffs' "honor or reputation"*

Plaintiffs elicited expert testimony that raises serious questions concerning whether the Work is a "work of recognized stature" as defined by VARA. Similarly, plaintiffs have shown the existence of such questions with regard to the impact destruction of the Work would have on their honor and reputation.

Robert Rosenblum, an art critic and professor of art history at New York University, was called to testify by plaintiffs. Professor Rosenblum is accomplished in his field, and has written more than twenty books on art and art history. Professor Rosenblum was clearly excited about the Work. He testified that "this was [a] coherent ongoing program" and that he wants "everybody to go and see it." (Tr., at 102). Further, Professor Rosenblum testified that the sculpture is "a work of art like almost nothing I've ever seen before," (Tr., at 104), and that "the one thing that I know absolutely is that this is an incredible phenomenon and I want to see it again and learn more about it. And I am sure there are countless other people who would feel like me if they saw it" (Tr., at 106). Finally, when asked by plaintiffs' attorney whether he had any opinion as to whether the artists' reputation would be harmed if this work were damaged or destroyed, Professor Rosenblum stated that their reputation would be damaged. (Tr., at 106–7, 108). Defendants did not proffer evidence or testimony to rebut Professor Rosenblum's opinions.

Furthermore, Kent Barwick, president of the Municipal Art Society of New York ("the Society"), and a former chairman of the New York City Landmarks Preservation Commission, was called by plaintiffs to testify as an expert witness. Mr. Barwick testified that the Society sponsors tours of "noteworthy works of art or architecture in the City of New York." (Tr., at 111). Mr. Barwick testified that, to this end, the Society organized a tour of the Work in February 1994. (Tr., at 111). Mr. Barwick stated that those who had gone on the February tour were "very, very excited" about the Work, and that they were anxious to have the tour of the Work made a permanent part of the Society's tour schedule. (Tr., at 111). Finally, Mr. Barwick testified that the Work constituted one of the great spaces located in New York (Tr., at 115) and that "it's very much in the public interest of the City of New York if it's at all possible to see this piece maintained and, if possible, finished" (Tr., at 117–18). Defendants did not cross-examine Mr. Barwick, or offer testimony to controvert his opinion.

Accordingly, on the record before the Court, I find that plaintiffs' have raised sufficiently serious questions going to the merits, with regard to these two issues, to make their claims a fair ground for litigation.

d. *Is VARA constitutional?*

In opposition to Plaintiffs' Motion, defendants raise several constitutional challenges to VARA. Defendants argue that, because VARA is unconstitutional, plaintiffs cannot succeed on the merits of their claims.

■■■ Defendants' constitutional challenges are not so likely to prevail at trial as to prevent the issuance of preliminary injunctive relief. In attacking a duly enacted Act of Congress as unconstitutional, the movant carries a heavy burden. Statutes enacted by legislative bodies are entitled to a strong presumption of constitutionality. *See, e.g., Schweiker v. McClure,* 452 U.S. 1301, 1303, 101 S.Ct. 2298, 2300, 69 L.Ed.2d 381 (1981); *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973); *United States v. Carolene Products Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784–85, 82 L.Ed. 1234 (1938); *see also Federal Election Commission v. Political Contributions Data, Inc.,* 943 F.2d 190, 191 (2d Cir.1991) ("It is a cardinal principal of statutory construction that congress is presumed to have passed statutes which are

constitutional."). On the record before the Court, defendants have failed to rebut the presumption that VARA is constitutional.

For example, defendants argue that VARA operates as an unconstitutional taking and rely on *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), to support this contention. The subject of *Loretto* was a New York statute that required landlords to permit the installation of cable television wiring in their buildings. VARA is distinguishable from the statute at issue in *Loretto*. VARA does not compel property owners to allow any invasion of their property interests. VARA merely places certain burdens upon a property owner that permits the installation of a work of visual art its property. Moreover, VARA does not require that a work of visual art, once installed, remain in place for perpetuity. Rather, the work must remain in place only during the creating artist's life. Finally, an owner or his agent may, at the time such a work is installed, seek from the artist or artists written consent to waive their VARA rights. If the artist or artists execute a written waiver of their VARA rights, the property owner retains complete authority to remove such works of visual art as are subsequently installed by the artist or artists.

## II. The Balance of Hardships Tips Decidedly Toward Plaintiffs

Plaintiffs have shown that they will suffer great hardship if the Work is altered or destroyed or if they and their invitees are denied access to the Lobby during reasonable business hours. In an attempt to demonstrate that they will suffer a hardship if this Court grants plaintiffs a preliminary injunction, defendants claim that the Work is unsafe. Apparently, this is intended to show that defendants might be subject to liability if a member of the public is injured by an unsafe condition present in the Lobby.

At the hearing, however, it was shown that this claim is tenuous. Any hazards that exist do not present an imminent threat to the public and may be remedied without altering or destroying the Work. Two expert witnesses, John H. Brooks and Michael Guilfoyle, both of whom inspected the Work while it was being created, testified that, in their opinion, the Work did not present a safety hazard. John H. Brooks, a certified welding inspector with 25 years experience in the field (Tr., at 121), testified that, of the "hundreds of welds" inspected by his firm, all were "acceptable" in terms of size and length (Tr., at 124, 164). Mr. Brooks testified further that, at the direction of the structural engineer assigned to the project, his firm tested two types of anchors used by plaintiffs to secure sculptural elements to the ceiling: Both types withstood a one thousand pound load. (Tr., at 130).

Michael Guilfoyle, the structural engineer employed by the net lessee "to insure that the attachments of the art work or the sculptures to the ceiling were adequate and safe" also testified regarding the safety of the Work. (Tr., at 158). Mr. Guilfoyle testified that, upon reviewing the Work, he requested certain alterations in order to ensure the long-term safety of the Work. (Tr., at 160, 162, 169). Mr. Guilfoyle testified that plaintiffs made some requested revisions, and were in the process of making additional revisions—such as adding additional welds and reinforcing certain supports—when defendants prohibited plaintiffs from further work on the Work. (Tr., at 163, 170). Mr. Guilfoyle testified that he did not believe that any of the potential safety hazards which he identified constituted an imminent threat. Rather, Mr. Guilfoyle stated that his concerns were directed to the long-term structural integrity of a few sculptural elements, and in his opinion, "there are no dangers to the public at present." (Tr., at 163). Indeed, defendants elicited on cross-examination Mr. Guilfoyle's opinion that there was no danger that any part of the Work would collapse within a one year period, even absent the modifications that he had suggested. (Tr., at 170–71).

Defendants attempted to rebut this testimony by calling several experts that were retained for the purpose of this litigation. Cornelius F. Dennis, who is self-employed as a construction, building code, and zoning consultant, testified regarding alleged safety hazards present in the Lobby and what he

viewed as noncompliance with New York City building codes. Prior to becoming self-employed, Mr. Dennis worked for the City of New York Department of Buildings. (Tr., at 243–44). Briefly summarized, Mr. Dennis testified that certain aspects of the Property are not, in his view, currently in compliance with New York City building codes and may present a safety threat.

Mr. Dennis' testimony, however, did not support defendants' claim that they will suffer hardship if a preliminary injunction is issued. First, Mr. Dennis stated that the majority of the alleged violations of building codes that he observed were the result of the building's configuration and design, and not the Work. (Tr., at 262). Second, Mr. Dennis testified that *all* the alleged safety hazards that he observed could be remedied without altering the Work. (Tr., at 280; *see* Tr., at 274–75).

Defendants also called Ernest Malafronte, a consultant in the field of electrical engineering (Tr., at 355), David Pereza, a civil engineer (Tr., at 389), and Frank P. Farinella, an architect (Tr., at 435), to testify regarding what they consider to be violations of New York City building and electrical codes present in the Lobby.

Mr. Malafronte testified that he conducted an hour-long walking tour of the 18,000 square foot Lobby and visually inspected the Work to ascertain whether there were any observable violations of the New York City electrical code ("the Electrical Code"). (Tr., at 357). Mr. Malafronte testified that he observed wiring that did not comply with the Electrical Code. (Tr., at 358–83). These violations included, in Mr. Malafronte's opinion, the use of an extension cord in lieu of conduit-enclosed wiring or an approved cable, the use of a non-UL listed chandelier, and wires that are spliced but not contained in an enclosed wiring box. (Tr., at 358–83). According to Mr. Malafronte, several of these purported violations resulted from the fact that the Work is unfinished. (Tr., at 384). Moreover, Mr. Malafronte testified that, in his opinion, the violations that he had observed could be corrected without altering the Work. (Tr., at 384–85).

Mr. Pereza, a civil engineer, was called to testify as to structural problems with the Work. Mr. Pereza, however, stated that he could not identify any structural deficiencies but that he observed "potential structural problems," and would recommend certain alterations to the Property. (Tr., at 429–30). Nothing in Mr. Pereza's testimony contradicts the other expert witnesses' testimony that any safety problems could be corrected without altering the Work.

Finally, defendants called Mr. Farinella, a licensed architect (Tr., at 435), who was retained by defendants to inspect the Property for violations of the New York City building code (Tr., at 437). Mr. Farinella testified that, in his opinion, the design of the Lobby sprinkler system, an unenclosed stairwell, and glass partitions installed in the Lobby by the previous net lessee, violate the New York City building codes. (Tr., at 439–41). Nonetheless, consistent with previous witnesses who testified about these conditions, Mr. Farinella testified that any violations could be corrected without altering the Work. (Tr., at 439–41).

In sum, the various experts who testified regarding the safety of the Work offered evidence that there may be long-term safety concerns associated with the Work, and that aspects of the Lobby currently do not comply with New York City building and electrical codes. All of the experts agreed, however, that any hazards or violations can be corrected without altering the Work. Indeed, the expert testimony proffered on this point showed that many corrective measures would not be difficult to implement. On the record before me, I conclude that, while there may be certain conditions that should be remedied, (1) any long-term potential safety hazards that exist do not pose an imminent safety hazard to the public; (2) any existing safety hazards can be remedied without altering the Work; and (3) several of the alleged safety hazards complained of by defendants exist solely because defendants have prohibited plaintiffs from completing the Work. Thus, I find that while plaintiffs would suffer great hardship if denied preliminary injunctive relief preserving the Work

during the pendency of this action, defendants would suffer little or no hardship.

Finally, defendants have failed to show that they will suffer any hardship if plaintiffs and their invitees are permitted access to the Lobby during regular business hours during the pendency of this action. Plaintiffs argue that the Lobby is open to the public during regular business hours. The hearing transcript is replete with evidence supporting this contention. For example, it is undisputed that a discount pharmacy and several other stores are located in the Lobby. These stores are open to the public, and access thereto is unregulated. Furthermore, the Lobby is designed as a pedestrian mall. Conversely, defendants have offered no evidence or testimony to show that the Lobby is not open to the public during regular business hours. Accordingly, it is unclear what, if any, burden defendants might suffer if plaintiffs and their invitees are permitted access to the Lobby.

Thus, plaintiffs have demonstrated that, with regard to their first and third requests for relief, the balance of hardships tips decidedly toward plaintiffs.

### CONCLUSION

Plaintiffs have shown that they will suffer irreparable harm if defendants are permitted to alter, deface, modify, or mutilate the Work. Plaintiffs also have shown that they will suffer irreparable injury if they or their invitees are barred from the Lobby during the pendency of this action. Moreover, plaintiffs have raised sufficiently serious questions going to the merits of their claims to make them a fair ground for litigation. Finally, plaintiffs have shown that the balance of hardships tips decidedly in their favor. Accordingly, plaintiffs are entitled to preliminary injunctive relief.

It is therefore ordered that, during the pendency of this action, defendants, their employees, and agents, are enjoined from (a) taking any action to alter, deface, modify, or mutilate plaintiffs' sculptures and installation located at 47–44 31st Street, Queens, New York; and (b) denying plaintiffs and their invitees access, between the hours of 9:00 a.m. and 5:00 p.m. Monday through Friday, to the Lobby of 47–44 31st Street, Queens, New York for the purpose of viewing, photographing, or videotaping the Work. It is further ordered that the security posted by plaintiffs in connection with the temporary restraining order issued by this Court be continued as security for this preliminary injunction.

SO ORDERED.