John CARTER, John Swing and John Veronis, Plaintiffs–Counter–Claim–Defendants–Appellees–Cross–Appellants,

v.

HELMSLEY–SPEAR, INC. and 474431 Associates, Defendants–Counter–Claimants–Appellants–Cross–Appellees.

Nos. 1269, 1549, Dockets 94–7990, 94–9038.

United States Court of Appeals, Second Circuit.

Argued March 15, 1995.

Decided Dec. 1, 1995.

---

Adrian Zuckerman, New York City (Robert C. Boneberg, Jill Rosenthal, Davidoff & Malito, New York City, of counsel), for Defendants–Counter–Claimants–Appellants–Cross–Appellees.

Charles Lozow, New York City (Daniel H. Weiner, John J. McGreevy, Patrick T. Perkins, Hughes Hubbard & Reed, New York City, of counsel), for Plaintiffs–Counter–Claim–Defendants–Appellees–Cross–Appellants.

Richard A. Altman, New York City, for Plaintiffs–Counter–Claim–Defendants–Appellees–Cross–Appellants.

Edward N. Costikyan, New York City (David Nissenbaum, The Municipal Art Society of New York, Inc., New York City, of counsel), filed a brief on behalf of The Municipal Art Society of New York, Inc. as Amicus Curiae.

Eli R. Mattioli, New York City (Robert C. Buff, Douglas D. Aronin, Wien, Malkin & Bettex, New York City, of counsel), filed a brief on behalf of The Real Estate Board of New York, Inc. as Amicus Curiae.

Roger L. Zissu, New York City (James D. Silberstein, Weiss Dawid Fross Zelnick & Lehrman, P.C., New York City, of counsel), filed a brief on behalf of Volunteer Lawyers for the Arts as Amicus Curiae.

Before: MESKILL, CARDAMONE, and ALTIMARI, Circuit Judges.

CARDAMONE, Circuit Judge:

Defendants 474431 Associates and Helmsley–Spear, Inc. (defendants or appellants), as the owner and managing agent respectively, of a commercial building in Queens, New York, appeal from an order of the United States District Court for the Southern District of New York (Edelstein, J.), entered on September 6, 1994 following a bench trial. The order granted plaintiffs, who are three artists, a permanent injunction that enjoined defendants from removing, modifying or destroying a work of visual art that had been installed in defendants' building by plaintiffs-artists commissioned by a former tenant to install the work. *See Carter v. Helmsley–Spear, Inc.*, 861 F.Supp. 303 (S.D.N.Y.1994). Defendants also appeal from the dismissal by the trial court of their counterclaim for waste. Plaintiffs cross-appeal from the dis-

missal of their cause of action for tortious interference with contractual relations and from the denial of their requests to complete the work and for an award of attorney's fees and costs.

On this appeal we deal with an Act of Congress that protects the rights of artists to preserve their works. One of America's most insightful thinkers observed that a country is not truly civilized "where the arts, such as they have, are all imported, having no indigenous life." 7 Works of Ralph Waldo Emerson, Society and Solitude, Chapt. II *Civilization* 34 (AMS. ed. 1968). From such reflection it follows that American artists are to be encouraged by laws that protect their works. Although Congress in the statute before us did just that, it did not mandate the preservation of art at all costs and without due regard for the rights of others.

For the reasons that follow, we reverse and vacate the grant of injunctive relief to plaintiffs and affirm the dismissal by the district court of plaintiffs' other claims and its dismissal of defendants' counterclaim for waste.

## BACKGROUND

Defendant 474431 Associates (Associates) is the owner of a mixed use commercial building located at 47–44 31st Street, Queens, New York, which it has owned since 1978. Associates is a New York general partnership. The general partners are Alvin Schwartz and Supervisory Management Corp., a wholly-owned subsidiary of Helmsley Enterprises, Inc. Defendant Helmsley–Spear, Inc. is the current managing agent of the property for Associates.

On February 1, 1990 Associates entered into a 48–year net lease, leasing the building to 47–44 31st Street Associates, L.P. (Limited Partnership), a Delaware limited partnership. From February 1, 1990 until June 1993, Irwin Cohen or an entity under his control was the general partner of the Limited Partnership, and managed the property through Cohen's SIG Management Company (SIG). Corporate Life Insurance Company (Corporate Life) was a limited partner in the Limited Partnership. In June 1993 SIG ceased its involvement with the property and Corporate Life, through an entity controlled by it, became the general partner of the Limited Partnership. The property was then managed by the Limited Partnership, through Theodore Nering, a Corporate Life representative. *See* 861 F.Supp. at 312. There is no relationship, other than the lease, between Associates, the lessor, and the Limited Partnership, the lessee.

Plaintiffs John Carter, John Swing and John Veronis (artists or plaintiffs) are professional sculptors who work together and are known collectively as the "Three–J's" or "Jx3." On December 16, 1991 SIG entered into a one-year agreement with the plaintiffs "engag[ing] and hir[ing] the Artists ... to design, create and install sculpture and other permanent installations" in the building, primarily the lobby. Under the agreement plaintiffs had "full authority in design, color and style," and SIG retained authority to direct the location and installation of the artwork within the building. The artists were to retain copyrights to their work and SIG was to receive 50 percent of any proceeds from its exploitation. On January 20, 1993 SIG and the artists signed an agreement extending the duration of their commission for an additional year. When Corporate Life became a general partner of the Limited Partnership, the Limited Partnership assumed the agreement with plaintiffs and in December 1993 again extended the agreement.

The artwork that is the subject of this litigation is a very large "walk-through sculpture" occupying most, but not all, of the building's lobby. The artwork consists of a variety of sculptural elements constructed from recycled materials, much of it metal, affixed to the walls and ceiling, and a vast mosaic made from pieces of recycled glass embedded in the floor and walls. Elements of the work include a giant hand fashioned from an old school bus, a face made of automobile parts, and a number of interactive components. These assorted elements make up a theme relating to environmental concerns and the significance of recycling.

The Limited Partnership's lease on the building was terminated on March 31, 1994.

It filed for bankruptcy one week later. The property was surrendered to defendant Associates on April 6, 1994 and defendant Helmsley–Spear, Inc. took over management of the property. Representatives of defendants informed the artists that they could no longer continue to install artwork at the property, and instead had to vacate the building. These representatives also made statements indicating that defendants intended to remove the artwork already in place in the building's lobby.

As a result of defendants' actions, artists commenced this litigation. On April 26, 1994 the district court issued a temporary restraining order enjoining defendants from taking any action to alter, deface, modify or mutilate the artwork installed in the building. In May 1994 a hearing was held on whether a preliminary injunction should issue. The district court subsequently granted a preliminary injunction enjoining defendants from removing the artwork pending the resolution of the instant litigation. See Carter v. Helmsley–Spear, Inc., 852 F.Supp. 228 (S.D.N.Y.1994).

A bench trial was subsequently held in June and July 1994, at the conclusion of which the trial court granted the artists the permanent injunction prohibiting defendants from distorting, mutilating, modifying, destroying and removing plaintiffs' artwork. Carter v. Helmsley–Spear, Inc., 861 F.Supp. 303, 337 (S.D.N.Y.1994). The injunction is to remain in effect for the lifetimes of the three plaintiffs. Plaintiffs' other claims, including their cause of action for tortious interference and a request for an award of costs and attorney's fees and that they be allowed to continue to add to the artwork in the lobby, as well as defendants' counterclaim for waste, were all dismissed with prejudice. This appeal and cross-appeal followed.

## DISCUSSION

### I Artists' Moral Rights

#### A. *History of Artists' Moral Rights*

Because it was under the rubric of the Visual Artists Rights Act of 1990 that plaintiffs obtained injunctive relief in the district court, we must explore, at least in part, the contours of that Act. In doing so it is necessary to review briefly the concept of artists' moral rights and the history and development of those rights in American jurisprudence, which led up to passage of the statute we must now examine.

█ The term "moral rights" has its origins in the civil law and is a translation of the French *le droit moral,* which is meant to capture those rights of a spiritual, non-economic and personal nature. The rights spring from a belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved. See Ralph E. Lerner & Judith Bresler, *Art Law* 417 (1989) (*Art Law* ). Because they are personal to the artist, moral rights exist independently of an artist's copyright in his or her work. See, e.g., 2 *Nimmer on Copyright* 8D–4 & n. 2 (1994) (*Nimmer* ).

█ While the rubric of moral rights encompasses many varieties of rights, two are protected in nearly every jurisdiction recognizing their existence: attribution and integrity. See *Art Law* at 420. The right of attribution generally consists of the right of an artist to be recognized by name as the author of his work or to publish anonymously or pseudonymously, the right to prevent the author's work from being attributed to someone else, and to prevent the use of the author's name on works created by others, including distorted editions of the author's original work. See, e.g., *id.* at 419–20; *Nimmer* at 8D–5. The right of integrity allows the author to prevent any deforming or mutilating changes to his work, even after title in the work has been transferred. See, e.g., *Art Law* at 420.

In some jurisdictions the integrity right also protects artwork from destruction. Whether or not a work of art is protected from destruction represents a fundamentally different perception of the purpose of moral rights. If integrity is meant to stress the public interest in preserving a nation's culture, destruction is prohibited; if the right is meant to emphasize the author's personality, destruction is seen as less harmful than the

continued display of deformed or mutilated work that misrepresents the artist and destruction may proceed. *See Art Law* at 421; *see also* 2 William F. Patry, *Copyright Law and Practice* 1044 n. 128 (1994) (*Copyright Law*) (noting the different models but suggesting that "destruction of a work shows the utmost contempt for the artist's honor or reputation").

Although moral rights are well established in the civil law, they are of recent vintage in American jurisprudence. Federal and state courts typically recognized the existence of such rights in other nations, but rejected artists' attempts to inject them into U.S. law. *See, e.g., Vargas v. Esquire, Inc.,* 164 F.2d 522, 526 (7th Cir.1947); *Crimi v. Rutgers Presbyterian Church,* 194 Misc. 570, 573–76 (N.Y.Sup.Ct.1949). Nonetheless, American courts have in varying degrees acknowledged the idea of moral rights, cloaking the concept in the guise of other legal theories, such as copyright, unfair competition, invasion of privacy, defamation, and breach of contract. *See Nimmer* at 8D–10; *Art Law* at 423.

In the landmark case of *Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14 (2d Cir.1976), we relied on copyright law and unfair competition principles to safeguard the integrity rights of the "Monty Python" group, noting that although the law "seeks to vindicate the economic, rather than the personal rights of authors ... the economic incentive for artistic ... creation ... cannot be reconciled with the inability of artists to obtain relief for mutilation or misrepresentation of their work to the public on which the artists are financially dependent." *Id.* at 24. Because decisions protecting artists rights are often "clothed in terms of proprietary right in one's creation," we continued, "they also properly vindicate the author's personal right to prevent the presentation of his work to the public in a distorted form." *Id.*

Artists fared better in state legislatures than they generally had in courts. California was the first to take up the task of protecting artists with the passage in 1979 of the California Art Preservation Act, Cal.Civ.Code § 987 *et seq.* (West 1982 & Supp.1995), followed in 1983 by New York's enactment of the Artist's Authorship Rights Act, N.Y.Arts & Cult. Aff. Law § 14.03 (McKinney Supp. 1995). Nine other states have also passed moral rights statutes, generally following either the California or New York models. *See generally Art Law* at 430–35; *id.* at 301–09 (Supp.1992) (describing the different states' laws).

## B. *Visual Artists Rights Act of 1990*

Although bills protecting artists' moral rights had first been introduced in Congress in 1979, they had drawn little support. *See Copyright Law* at 1018 n. 1. The issue of federal protection of moral rights was a prominent hurdle in the debate over whether the United States should join the Berne Convention, the international agreement protecting literary and artistic works. Article 6*bis* of the Berne Convention protects attribution and integrity, stating in relevant part:

> Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

Berne Convention for the Protection of Literary and Artistic Works, September 9, 1886, art. 6*bis*, S.Treaty Doc. No. 27, 99th Cong., 2d Sess. 41 (1986).

The Berne Convention's protection of moral rights posed a significant difficulty for U.S. adherence. *See Copyright Law* at 1022 ("The obligation of the United States to provide *droit moral* ... was the single most contentious issue surrounding Berne adherence."); *Nimmer* at 8D–15 ("During the debate over [the Berne Convention Implementation Act], Congress faced an avalanche of opposition to moral rights, including denunciations of moral rights by some of the bill's most vociferous advocates."); H.R.Rep. No. 514, 101st Cong., 2d Sess. 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6917 ("After almost 100 years of debate, the United States joined the Berne Convention.... [C]onsensus over United States adherence was slow to develop in large part because of debate over the requirements of Article 6*bis.*").

Congress passed the Berne Convention Implementation Act of 1988, Pub.L. No. 100–568, 102 Stat. 2853 (1988), and side-stepped the difficult question of protecting moral rights. It declared that the Berne Convention is not self-executing, existing law satisfied the United States' obligations in adhering to the Convention, its provisions are not enforceable through any action brought pursuant to the Convention itself, and neither adherence to the Convention nor the implementing legislation expands or reduces any rights under federal, state, or common law to claim authorship of a work or to object to any distortion, mutilation, or other modification of a work. *See id.* §§ 2, 3; *see also* S.Rep. No. 352, 100th Cong., 2d Sess. 9–10 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3706, 3714–15.

Two years later Congress enacted the Visual Artists Rights Act of 1990 (VARA or Act), Pub.L. No. 101–650 (tit. VI), 104 Stat. 5089, 5128–33 (1990). Construing this Act constitutes the subject of the present appeal. The Act

> protects both the reputations of certain visual artists and the works of art they create. It provides these artists with the rights of "attribution" and "integrity." ...
>
> These rights are analogous to those protected by Article 6*bis* of the Berne Convention, which are commonly known as "moral rights." The theory of moral rights is that they result in a climate of artistic worth and honor that encourages the author in the arduous act of creation.

H.R.Rep. No. 514 at 5 (internal quote omitted). The Act brings to fruition Emerson's insightful observation.

Its principal provisions afford protection only to authors of works of visual art—a narrow class of art defined to include paintings, drawings, prints, sculptures, or photographs produced for exhibition purposes, existing in a single copy or limited edition of 200 copies or fewer. 17 U.S.C. § 101 (Supp. III 1991). With numerous exceptions, VARA grants three rights: the right of attribution, the right of integrity and, in the case of works of visual art of "recognized stature," the right to prevent destruction. 17 U.S.C. § 106A (Supp. III 1991). For works created on or after June 1, 1991—the effective date of the Act—the rights provided for endure for the life of the author or, in the case of a joint work, the life of the last surviving author. The rights cannot be transferred, but may be waived by a writing signed by the author. Copyright registration is not required to bring an action for infringement of the rights granted under VARA, or to secure statutory damages and attorney's fees. 17 U.S.C. §§ 411, 412 (1988 & Supp. III 1991). All remedies available under copyright law, other than criminal remedies, are available in an action for infringement of moral rights. 17 U.S.C. § 506 (1988 & Supp. III 1991). With this historical background in hand, we pass to the merits of the present litigation.

## II Work of Visual Art

Because VARA is relatively new, a fuller explication of it is helpful. In analyzing the Act, therefore, we will follow in order the definition set forth in § 101, as did the district court when presiding over this litigation. The district court determined that the work of art installed in the lobby of Associates' building was a work of visual art as defined by VARA; that distortion, mutilation, or modification of the work would prejudice plaintiffs' honor and reputations; that the work was of recognized stature, thus protecting it from destruction (including removal that would result in destruction); and that Associates consented to or ratified the installation of the work in its building. The result was that defendants were enjoined from removing or otherwise altering the work during the lifetimes of the three artists.

### A. *Singleness of the Work*

As a preliminary matter, we must determine whether the trial court correctly found that the work is a single piece of art, to be analyzed under VARA as a whole, rather than separate works to be considered individually. This finding was a factual one reviewed under the clearly erroneous standard. For purposes of framing the issues at trial the parties entered into a joint stipulation relating to numerous facts, including a definition of "the Work." This stipulated defini-

tion contained a long, detailed list of all the sculptural elements contained in the building's lobby. The district court found that, with a few precise exceptions determined to be separate works of art, the artwork created by plaintiffs in the lobby was a single work. See 861 F.Supp. at 314–15. This finding was based on testimony, credited by the trial judge, of the artists themselves and of their expert witnesses.

The trial court found further support for its conclusion in the method by which the artists created the work—each additional element of the sculpture was based on the element preceding it so that they would mesh together. The result was a thematically consistent, inter-related work whose elements could not be separated without losing continuity and meaning. See id. at 315. The record evidence of singleness was confirmed at the request of the parties by the district court's own inspection of the work.

■ Appellants' primary contention is that the finding of singleness is inconsistent with a finding that certain works of art were separate from the work that is the subject of this appeal. This assertion rests on the mistaken belief that the parties' joint stipulation to a definition of "the Work" precluded an ultimate determination by the factfinder that most but not all of the work installed in the lobby was a single artwork. In other words, according to appellants, either every component in the stipulated definition is part of a single work or every component is an individual work; there is no middle ground. Appellants' goal is to have VARA applied to each element of the sculpture individually, so that components that may not be visual art standing alone cannot be considered visual art when they are combined by the artists to create a whole that has a nature different than the mere sum of its parts.

Appellants' goal is not attainable. The parties stipulated that when they used the term "the Work" it included a list of sculptural components. The result was that during the trial there was no dispute as to the parties' meaning when referring to "the Work." The trial court was free to find that a few items of "the Work" were separate works of art, while the remainder of "the

Work" was a single, interrelated, indivisible work of art. The finding of singleness was based on determinations of witness credibility as well as the district court's own inspection of the artwork. We cannot say that such a finding was clearly erroneous.

### B. *The Statutory Definition*

A "work of visual art" is defined by the Act in terms both positive (what it is) and negative (what it is not). In relevant part VARA defines a work of visual art as "a painting, drawing, print, or sculpture, existing in a single copy" or in a limited edition of 200 copies or fewer. 17 U.S.C. § 101. Although defendants aver that elements of the work are not visual art, their contention is foreclosed by the factual finding that the work is a single, indivisible whole. Concededly, considered as a whole, the work is a sculpture and exists only in a single copy. Therefore, the work satisfies the Act's positive definition of a work of visual art. We next turn to the second part of the statutory definition—what is not a work of visual art.

The definition of visual art excludes "any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audio-visual work." 17 U.S.C. § 101. Congress meant to distinguish works of visual art from other media, such as audio-visual works and motion pictures, due to the different circumstances surrounding how works of each genre are created and disseminated. See H.R.Rep. No. 514 at 9. Although this concern led to a narrow definition of works of visual art,

> [t]he courts should use common sense and generally accepted standards of the artistic community in determining whether a particular work falls within the scope of the definition. Artists may work in a variety of media, and use any number of materials in creating their works. Therefore, whether a particular work falls within the definition should not depend on the medium or materials used.

*Id.* at 11.

■ "Applied art" describes "two- and three-dimensional ornamentation or decoration that is affixed to otherwise utilitarian

objects." *Carter,* 861 F.Supp. at 315, *citing Kieselstein–Cord v. Accessories By Pearl, Inc.,* 632 F.2d 989, 997 (2d Cir.1980). Defendants' assertion that at least parts of the work are applied art appears to rest on the fact that some of the sculptural elements are affixed to the lobby's floor, walls, and ceiling—all utilitarian objects. Interpreting applied art to include such works would render meaningless VARA's protection for works of visual art installed in buildings. A court should not read one part of a statute so as to deprive another part of meaning. *See, e.g., United States Nat'l Bank of Or. v. Independent Ins. Agents of America, Inc.,* 508 U.S. 439, ——, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993); *United States v. LaPorta,* 46 F.3d 152, 156 (2d Cir.1994).

Appellants do not suggest the entire work is applied art. The district court correctly stated that even if components of the work standing alone were applied art, "nothing in VARA proscribes protection of works of visual art that incorporate elements of, rather than constitute, applied art." 861 F.Supp. at 315. VARA's legislative history leaves. no doubt that "a new and independent work created from snippets of [excluded] materials, such as a collage, is of course not excluded" from the definition of a work of visual art. H.R.Rep. No. 514 at 14. The trial judge correctly ruled the work is not applied art precluded from protection under the Act.

### III Work Made for Hire

Also excluded from the definition of a work of visual art is any work made for hire. 17 U.S.C. § 1012(B). A "work made for hire" is defined in the Copyright Act, in relevant part, as "a work prepared by an employee within the scope of his or her employment." *Id.* § 101(1). Appellants maintain the work was made for hire and therefore is not a work of visual art under VARA. The district court held otherwise, finding that the plaintiffs were hired as independent contractors.

#### A. *Reid Tests*

The Copyright Act does not define the terms "employee" or "scope of employment." In *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), the Supreme Court looked to the general common law of agency for guidance. It held that a multi-factor balancing test was required to determine if a work was produced for hire (by an employee) or was produced by an independent contractor. *Reid,* 490 U.S. at 751, 109 S.Ct. at 2178. The Court elaborated 13 specific factors:

> the hiring party's right to control the manner and means by which the product is accomplished.... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid,* 490 U.S. at 751–52, 109 S.Ct. at 2178–79. While all of these factors are relevant, no single factor is determinative. *Id.* at 752. *See also Hilton International Company v. NLRB,* 690 F.2d 318, 321 (2d Cir.1982). Instead, the factors are weighed by referring to the facts of a given case. *See Aymes v. Bonelli,* 980 F.2d 857, 861 (2d Cir.1992).

The district court determined that the sculpture was not "work for hire" and therefore not excluded from the definition of visual art. The *Reid* test is a list of factors not all of which may come into play in a given case. *See Aymes,* 980 F.2d at 861. The *Reid* test is therefore easily misapplied. We are usually reluctant to reverse a district court's factual findings as to the presence or absence of any of the *Reid* factors and do so only when the district court's findings are clearly erroneous. By contrast, the ultimate legal conclusion as to whether or not the sculpture is "work for hire" is reviewed *de novo.* The district court correctly stated the legal test. But some of its factual findings, we think, were clearly erroneous.

## B. *Factors Applied*

The district court properly noted that *Aymes* established five factors which would be relevant in nearly all cases: the right to control the manner and means of production; requisite skill; provision of employee benefits; tax treatment of the hired party; whether the hired party may be assigned additional projects. *See* 980 F.2d at 861. Analysis begins with a discussion of these factors.

First, plaintiffs had complete artistic freedom with respect to every aspect of the sculpture's creation. Although the artists heeded advice or accepted suggestions from building engineers, architects, and others, such actions were not a relinquishment of their artistic freedom. The evidence strongly supports the finding that plaintiffs controlled the work's "manner and means." This fact, in turn, lent credence to their contention that they were independent contractors. *See Hilton,* 690 F.2d at 320. While artistic freedom remains a central factor in our inquiry, the Supreme Court has cautioned that "the extent of control the hiring party exercises over the details of the product is not dispositive." *Reid,* 490 U.S. at 752, 109 S.Ct. at 2179. Hence, resolving the question of whether plaintiffs had artistic freedom does not end the analysis.

The district court also correctly found the artists' conception and execution of the work required great skill in execution. Appellants' contention that the plaintiffs' reliance on assistants in some way mitigates the skill required for this work is meritless, particularly because each of the plaintiffs is a professional sculptor and the parties stipulated that professional sculpting is a highly skilled occupation. The right to control the manner and means and the requisite skill needed for execution of this project were both properly found by the district court to weigh against "work for hire" status.

The trial court erred, however, when it ruled that the defendants could not assign the artists additional projects. First, the employment agreement between SIG Management Company and the artists clearly states that the artists agreed not only to install the sculpture but also to "render such other related services and duties as may be assigned to [them] from time to time by the Company." By the very terms of the contract the defendants and their predecessors in interest had the right to assign other related projects to the artists. The district court incorrectly decided that this language supported the artists' claim to be independent contractors. While the artists' obligations were limited to related services and duties, the defendants nonetheless did have the right to assign to plaintiffs work other than the principal sculpture.

Further, the defendants did, in fact, assign such other projects. The district court concedes as much, explaining that "plaintiffs did create art work on the property other than that in the Lobby." *Carter,* 861 F.Supp. at 319. The record shows the artists performed projects on the sixth floor of the building, on the eighth floor, and in the boiler room. Thus, on at least three different occasions the plaintiffs were assigned additional projects, which they completed without further compensation. The trial court suggests this fact "does not undermine plaintiffs' contention that they were hired solely to install art work on the Property." *Id.* We disagree. If the artists were hired to perform work other than the sculpture (as both their employment agreement and their actual practice suggests) then they were *not* hired *solely* to install the sculpture. It makes no difference that all work performed by the plaintiffs was artistic in nature. The point is that the performance of other assigned work not of the artists' choosing supports a conclusion that the artists were not independent contractors but employees.

We must also consider factors the district court correctly found to favor finding the sculpture to be work for hire. Specifically, the provision of employee benefits and the tax treatment of the plaintiffs weigh strongly in favor of employee status. The defendants paid payroll and social security taxes, provided employee benefits such as life, health, and liability insurance and paid vacations, and contributed to unemployment insurance and workers' compensation funds on plaintiffs' behalf. Moreover, two of the three artists filed for unemployment benefits after their

positions were terminated, listing the building's management company as their former employer. Other formal indicia of an employment relationship existed. For instance, each plaintiff was paid a weekly salary. The artists also agreed in their written contract that they would work principally for the defendants for the duration of their agreement on a 40-hour per week basis and they would only do other work to the extent that it would not "interfere with services to be provided" to the defendants. All of these facts strongly suggest the artists were employees.

Some of the other *Reid* factors bolster this view. The artists were provided with many (if not most) of the supplies used to create the sculpture. This factor was not, as the district court found, "inconclusive." The court also wrongly ruled that plaintiffs were hired for a "finite term of engagement." In fact, they were employed for a substantial period of time, their work continuing for over two years with no set date of termination (other than the sculpture's completion). Nor was the fact that the artists could not hire paid assistants without the defendants' approval "inconclusive" as the trial court erroneously found. Instead, this and the other just enumerated factors point towards an employer-employee relationship between the parties.

In reaching its conclusion, the district court also relied partly on the artists' copyright ownership of the sculpture, viewing such ownership as a "plus factor." We are not certain whether this element is a "plus factor," and therefore put off for another day deciding whether copyright ownership is probative of independent contractor status. Even were it to be weighed as a "plus factor," it would not change the outcome in this case.

### C. *Employee Status*

 Our review of the legal conclusion drawn from balancing the various *Reid* factors persuades us that the factors that weigh in favor of finding the artists were employees outweigh those factors supporting the artists' claim that they were independent contractors. One of the factors that did not persuade us was the appellants' simplistic contention that usage of the words "employ" or "employment" in the agreements between the artists and SIG or the Limited Partnership establishes that the plaintiffs were employees. The use of these terms does not transform them into "magic words" imbued with legally controlling significance.

Again, we emphasize that despite the conclusion reached we do not intend to marginalize factors such as artistic freedom and skill, making them peripheral to the status inquiry. The fact that artists will always be retained for creative purposes cannot serve to minimalize this factor of the *Reid* test, even though it will usually favor VARA protection. Also, that the work was produced on the employer's premises is a necessary incident to all nonremovable art and therefore should not carry great weight. Similarly, we were not swayed by the boilerplate contract language or the accounting decision to deduct FICA taxes. To so read § 101 runs against the broad remedial purposes of VARA. As discussed earlier, the moral rights of the artist whose artistic work comes under VARA's umbrella are to be protected, not ignored, in light of Congress' pathbreaking legislation.

Moreover, because the *Reid* test is fact-dependent, future cases involving the work for hire question will not always fit neatly into an employee or independent contractor category. We also recognize that by counting indicia such as health insurance and paid vacations against the artists' independent contractor status, it may appear that artists regrettably are being forced to choose between the personal benefits inuring in an employment relationship and VARA's protection of the artists' work afforded only to independent contractors. Of course, when an employer today denies an artist "basic attributes of employment" like vacation time or health benefits, such denial will be wholly inconsistent with a "work for hire" defense. *See Aymes*, 980 F.2d at 862-63.

Consequently, while the existence of payroll formalities alone would not be controlling, *see Reid*, 490 U.S. at 743 n. 8, 109 S.Ct. at 2174 n. 8, in combination with other factors, it may lead to a conclusion that a given work is one made for hire. Such other fac-

tors include: plaintiffs under their contract could be and were in fact assigned projects in addition to the work in the lobby; they were paid a weekly salary for over two years for a contracted 40 hours of work per week; they were furnished many of the needed supplies necessary to create the work; and plaintiffs could not hire paid assistants without defendants' consent. These factors, properly considered and weighed with the employee benefits granted plaintiffs and the tax treatment accorded them, are more than sufficient to demonstrate that the artists were employees, and the sculpture is therefore a work made for hire as a matter of law.

### IV Defendants' Counterclaim and Plaintiffs' Cross-appeal

Finally, since we have determined that the work is one made for hire and therefore outside the scope of VARA's protection, we need not discuss that Act's broad protection of visual art and the protection it affords works of art incorporated into a building. Also, as plaintiffs' sculpture was not protected from removal because the artists were employees and not independent contractors, we need not reach the defendants' Fifth Amendment takings argument.

Moreover, because the sculpture is not protected by VARA from removal resulting in its destruction or alteration, we do not address plaintiffs' contentions that VARA entitles them to complete the "unfinished" portion of the work, that they are entitled to reasonable costs and attorney's fees, and that appellants tortiously interfered with the artists' contract with SIG and the Limited Partnership. Finally, the district court dismissed defendants' counterclaim against the artists for waste, finding, *inter alia,* that such a cause of action under New York law may only be brought by a landlord against a tenant. *See* 861 F.Supp. at 334–36. Appellants have failed to persuade us that it was error to dismiss this counterclaim.

### CONCLUSION

Accordingly, the district court's order insofar as it held the work was one not made for hire is reversed and the injunction vacated. In all other respects, the order of the district court is affirmed. Each party to bear its own costs.