*Horror Inc. v. Miller*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term 2019

(Argued:  February 13, 2020      Decided:  September 30, 2021)

Docket No. 18-3123-cv

HORROR INC., A MASSACHUSETTS CORPORATION, MANNY COMPANY, A CONNECTICUT LIMITED PARTNERSHIP,

*Plaintiffs–Counter-Defendants–Appellants*,

–v.–

VICTOR MILLER, AN INDIVIDUAL,

*Defendant–Counter-Claimant–Appellee*,

DOES, 1 THROUGH 10, INCLUSIVE,

*Defendants*.

B e f o r e :

WALKER and CARNEY, *Circuit Judges*.*

---

* Circuit Judge Ralph K. Winter, originally a member of this panel, died before this decision issued. The remaining members of the panel, being in agreement, have issued this Opinion.

This dispute concerns whether, for Copyright Act purposes, the screenwriter Victor Miller was an employee or independent contractor of the film production company Manny, Inc., in 1979, when Miller wrote the screenplay for the landmark horror film *Friday the 13th*, released in 1980. Almost forty years later, in 2016, Miller gave notice to Manny purporting to terminate its copyright under the authority vested in authors by section 203 of the Act. *See* 17 U.S.C. § 203. If Miller was Manny's employee when he wrote the screenplay, then it is a "work made for hire" under the Act; Manny, not Miller, owns the screenplay; and Miller's notice is of no effect. Alternatively, if Miller was an independent contractor vis-à-vis Manny when he wrote the screenplay, and if certain other conditions are satisfied, then Miller is entitled to terminate Manny's and its successors' rights and, as author, to reclaim his own. Manny argues primarily that Miller's membership in the Writers' Guild of America, East, Inc. ("WGA"), and Manny's participation in the producers' collective bargaining agreement with the WGA in the same period establish that Miller was Manny's employee for Copyright Act purposes. We reject that argument and conclude that Miller was an independent contractor when he wrote the screenplay and is therefore entitled to authorship rights. Accordingly, the notice of termination that he gave under section 203 is effective as to Manny and its successors. We therefore **AFFIRM** the District Court's order granting summary judgment to Miller.

AFFIRMED.

———————

KATHLEEN SULLIVAN (Todd Anten, *on the brief*), Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA (Bonnie E. Eskenazi, Julia R. Haye, Greenberg Glusker Fields Claman & Machtinger LLP, Los Angeles, CA, *on the brief*), *for Plaintiffs–Counter-Defendants–Appellants*.

MARC TOBEROFF, Toberoff & Associates, P.C., Malibu, CA, *for Defendant–Counter-Claimant–Appellee*.

———————

CARNEY, Circuit Judge:

This dispute concerns whether, for Copyright Act purposes, the screenwriter Victor Miller was an employee or independent contractor of the film production

2

company Manny, Inc., in 1979, when Miller wrote the screenplay for the landmark horror film *Friday the 13th*, released in 1980. Almost forty years later, in 2016, Miller gave notice to Manny purporting to terminate its copyright under the authority vested in authors by section 203 of the Act. *See* 17 U.S.C. § 203. If Miller was Manny's employee when he wrote the screenplay, then it is a "work made for hire" under the Act; Manny, not Miller, owns the screenplay; and Miller's notice is of no effect. Alternatively, if Miller was an independent contractor vis-à-vis Manny when he wrote the screenplay, and if certain other conditions are satisfied, then Miller is entitled to terminate Manny's and its successors' rights and, as author, to reclaim his own.

Manny argues primarily that Miller's membership in the Writers' Guild of America, East, Inc. ("WGA"), and Manny's participation in the producers' collective bargaining agreement with the WGA in the same period establish that Miller was Manny's employee for Copyright Act purposes. We reject that argument and conclude that Miller was an independent contractor when he wrote the screenplay and is therefore entitled to authorship rights. Accordingly, the notice of termination that he gave under section 203 is effective as to Manny and its successors.

We **AFFIRM** the District Court's order granting summary judgment to Miller.

## BACKGROUND

### I.     Factual Background

The following statement of the facts is taken from the careful and comprehensive opinion by District Judge Stefan R. Underhill, which was based on the record at summary judgment. *See Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 285 (D. Conn. 2018). The relevant facts were essentially undisputed by the parties.

Victor Miller is a professional writer of novels, screenplays, and teleplays. Sean S. Cunningham is a producer, director, and writer of feature films. His company, Sean S.

Cunningham Films Ltd., is the general partner of Manny Company, a Connecticut limited partnership. Cunningham formed Manny as a corporate vehicle for producing and distributing motion pictures. Miller and Cunningham, then close friends and both residents of Connecticut, began working together professionally in or about 1976. During the five-year period that followed, they collaborated on five motion pictures.

Since 1974, Miller has been a member of the Writers Guild of America, East. The WGA is a federally recognized labor union representing writers in the film and television industry. In 1978, Manny became a signatory to the 1977 WGA Theatrical and Television Basic Agreement (also referred to as the "Minimum Basic Agreement" or the "MBA"), the then-operative collective bargaining agreement governing WGA writers and signatory employers.[1]

In 1979, the nationwide success of *Halloween*, a low-budget horror film, inspired Cunningham to produce his own horror film. Cunningham contacted Miller about the idea. In late spring of 1979, Miller and Cunningham "orally agreed that Miller would write the screenplay for [the] horror film project." App'x at 90. Sometime in June of that year—the document is not dated—Manny and Miller executed an agreement using the 1977 WGA standard form entitled "Writer's Flat Deal Contract" (the "Contract"). *Id.* at 71, 99. A brief, two-page document entitled "Employment Agreement," it comprised primarily an introduction and six numbered paragraphs. *Id.* at 99-100. The text affirmed

---

[1] As Manny describes it (and Miller does not dispute), the MBA provides certain protections to WGA writers. These address minimum salary requirements; payments of residuals; payments for sequels; maximum time periods of employment for a film; rules for screen credits; WGA arbitration in case of disputes over credit; payment of location expenses; the right to watch a preliminary cut or preview; the right to consult on translations; the right to WGA representation to enforce compliance with WGA rules; pension benefits under the Producers' and WGA's joint Pension Plan, which is governed by ERISA, and to which the employer contributes a percentage of the writer's compensation; and health and welfare benefits under the Producers' and WGA's joint Health and Welfare Fund, also governed by ERISA, and to which the employer contributes.

that Miller was a member of the WGA, that Manny was a signatory to the MBA, and that its terms could not be "less advantageous to [Miller] than the minimums provided in said MBA." *Id.* at 99. It provided that Manny "employ[ed] the Writer"—Miller—"to write a complete and finished screenplay for a proposed motion picture to be budgeted at $under $1 million [sic], and presently entitled or designated Friday 13." *Id.* In exchange, Manny promised to "pay [Miller] as full compensation for his services" $9,282 in two lump-sum payments: $5,569 for delivery of the first draft of the screenplay, and $3,713 for delivery of the final draft. *Id.* at 99-100. Each payment was to be made "within forty-eight (48) hours after delivery" of the promised product. *Id.* at 100. It advised, "this Agreement contemplates payment of the entire agreed[-]upon compensation." *Id.*

After Cunningham recruited Miller for the project, Miller viewed the recently released *Halloween*, discussed ideas and locations for the film with Cunningham, and developed the idea for setting the film at a summer camp before the camp seasons opens (Miller suggested the idea; Cunningham agreed). He then wrote a treatment for the horror film, at the time entitled "The Long Night at Camp Blood" (the "Treatment").[2] Miller next proceeded to write first and second drafts of the related screenplay (the "Screenplay"), and over time revised the second draft, developing the Screenplay in its final form. The revisions included adding references to "Friday the 13th" (the title suggested by Cunningham), and a new ending (one that project investor Phil Scuderi insisted on).

---

[2] According to the 1977 MBA, a "treatment" is "[a]n adaptation of a story, book, play or other literary, dramatic or dramatico-musical material for motion picture purposes in a form suitable for use as the basis of a screenplay." App'x at 293. A "screenplay" is more fully developed than a treatment; it is defined as "the final script with individual scenes, full dialogue and camera setups." *Id.*

Miller wrote various versions of the Treatment and Screenplay over the course of approximately two months. As with Miller and Cunningham's past collaborations, the two worked closely together to develop the two documents. Miller described how, during the writing process, the pair "enthusiastically bounced ideas off of one another." *Id.* at 423. Miller and Cunningham met at each other's homes to discuss ideas for the Film, and Miller drafted the Treatment and Screenplay at his own home, on his own typewriter, using his own typewriter ribbon and paper. Miller made use of Cunningham's photocopier and photocopy paper, and Cunningham's assistant re-typed the second draft of the Screenplay to reformat the draft to contain certain margin content.

Miller usually did his writing in the morning because he was a "morning person" and preferred to write between "7 a.m. and noon," and not because Cunningham would dictate Miller's specific work hours. *Id.* at 423. Miller was responsible, however, for conforming his completion of screenplay drafts to the demands of the Film's broader production schedule. Cunningham had no right to assign Miller additional projects beyond the writing of the Screenplay provided in the Contract.

The parties dispute the extent to which Cunningham dictated the contents of the Treatment and Screenplay. Cunningham averred that he "tutor[ed] Miller on key elements of successful horror films," *id.* at 90, and "retained final authority over what went into, or stayed out of, the Screenplay, *id.* at 638. According to Cunningham, sometimes, while "Miller drafted on his typewriter, [Cunningham] stood over [Miller's] shoulder making suggestions and contributions." *Id.* at 638. In contrast, although Miller acknowledges that Cunningham provided "notes or suggestions" on the Screenplay drafts, he contends that "Cunningham did not dictate what [Miller] should do or write." *Id.* at 664. The parties agree, however, that Cunningham made the following

general suggestions: that the killings throughout the movie should be "personal" (and that guns are "impersonal" ways to kill in movies); that the killer should always remain masked; and that a major character should be killed early on. *Id.* at 78, 195-96, 787.

It is undisputed that, although Cunningham and Miller often collaborated on the Treatment and Screenplay, Miller consistently received "sole 'written by' credit" as the screenwriter for the Film. App'x at 639. Indeed, Cunningham stated that he "wanted Miller, [his] friend, to have the screenwriting credit." *Id.* For example, after Miller completed an early draft of the Treatment, Cunningham revised and edited it to create a version to show to potential investors. Cunningham's revisions included adding a title page that read:

FRIDAY 13
A Screenplay Treatment
By
Victor Miller

The version of the second draft screenplay typed by Cunningham's assistant similarly contained a title page, identically formatted and announcing, "A Screenplay By Victor Miller."

During the same summer, in 1979, Cunningham accepted an offer from investor Phil Scuderi, the principal of Georgetown Productions, Inc. ("Georgetown"), to finance *Friday the 13th* in exchange for giving Georgetown "complete control over the Screenplay and the Film." *Id.* at 94. Cunningham recounted that, after agreeing to this arrangement, Scuderi "provided extensive notes, mark-ups and ideas which were incorporated into the final shooting script and Film itself." *Id.* at 95. Cunningham did not offer any details on Scuderi's "extensive" changes to the script, except for noting that Scuderi altered the Film's closing scene as follows: Scuderi proposed that, in the final scene, "the character 'Jason'—who, in Miller's Treatment and Screenplay, died as a young boy and never appears in any of Miller's drafts—emerges from the depths of the lake as a disfigured

child, and reaches out of the water to pull one of the main protagonists into the lake." *Id.*

As Cunningham recalls it, Miller "was vehemently opposed to the idea of Jason coming back to life at all . . . because the whole point of [Miller's] script was that Jason's mother killed the camp counselors as vengeance for her son's death." *Id.* Cunningham, too, was "not fond" of Scuderi's proposed change to the final scene. *Id.* Nevertheless, "[a]t Georgetown's insistence, [Scuderi's] scene was written and incorporated into the Film, and gave birth to the character Jason as an immortal adult killer who returned from the dead, and to numerous sequels in the franchise." *Id.* Also in 1979, as provided by the Contract, Manny paid Miller $9,282 for his work, in the designated two lump-sum payments.

In 1980, Manny assigned its rights in the Film and Screenplay to Georgetown (the "Georgetown Agreement"), and Georgetown duly registered the related copyrights.[3] The registration listed "Georgetown Productions, Inc." as the Film's author, and it described the Film as a "work made for hire." *Id.* at 400. The Copyright Office's digital version of the Screenplay, however, provides a "written by" credit to Miller. *Horror Inc.*, 335 F. Supp. 3d at 291. Horror Inc., a third company owned by persons new to the project, later acquired from Georgetown the rights, title, and interest to the *Friday the 13th* franchise, including rights to the Screenplay and the Film. Horror became the successor-in-interest to Georgetown and Manny regarding these copyrighted properties.

---

[3] The copyright registration describes the "nature of" the copyrighted work as a "motion picture photoplay." App'x at 400. The registration lists Georgetown as the "author" of the "entire work," and claims copyright protection for the "Screenplay, [certain] musical compositions[,] and other literary and cinematographic materials." *Id.* at 400-01.

The Film *Friday the 13th* opened on May 9, 1980. Cunningham described it as "an immediate hit," App'x at 96, that over time "enjoy[ed] unprecedented box office success for a horror film," *id.* It has since spawned eleven sequels, among other derivative products.

Several years after the opening, Miller began to believe that he was not receiving the additional sequel and residual payments on the Film that he was due under the MBA. The WGA pursued the matter on his behalf, and in the late 1980s, Miller received a settlement of $27,396.46. Cunningham estimates that Miller has also received approximately $220,000 from Horror related to "residuals, sequels, and other payments under the employment agreement." *Id.* at 251.

## II.   Procedural History

In 2016, Miller sought to reclaim his copyright ownership of the Screenplay by invoking his termination rights available to authors under section 203(a) of the Copyright Act, 17 U.S.C. §§ 101, *et seq.*, and serving the requisite notices of termination on Manny and Horror.[4] In response, Manny and Horror sued Miller in the United States

---

[4] In January 2016, Miller served his first Notice of Termination on all defendants "except Robert Barsamian and his various entities (Horror, Inc., Jason Inc., Terror, Inc., Georgetown Productions, Inc., Belmont Management, Inc., Jason Productions, Inc., and Friday Four, Inc.)." App'x at 623 n.3. Miller served a second Notice "to include these additional parties" in June 2016. *Id.* According to Miller's Notices of Termination, Miller transferred his rights in the Screenplay to Manny on July 6, 1979, pursuant to the Contract, which was signed by the parties "on or about June 4, 1979." *Id.* at 619; *see also id.* at 98-100 (WGA Correspondence and Writer's Flat Deal Contract), 120 (Georgetown Agreement assigning rights in "screenplay written by Victor Miller"). The parties do not dispute that Miller conveyed his interest in the Screenplay to Manny in the summer of 1979. Regarding the scope of Miller's authorship rights, Miller's Notice of Termination by its terms applies to the rights that he "grant[ed] or transfer[red]" to Manny under the Contract, specifically his rights in "the original screenplay written by Victor Miller and entitled 'A Long Night at Camp Blood' a.k.a. 'Friday 13' (the 'Work') on which the movie 'Friday the 13th' (1980) was based." *Id.* at 619, 622. The Notice also applies "to each and every element of such work, including the characters therein, and to each and every prior draft or iteration of the Work." *Id.* at 619 n.2, 622 n.2. Miller initially assigned his rights in the Screenplay

District Court for the District of Connecticut, seeking a declaration that Miller wrote the Screenplay as a "work for hire" within the meaning of the Act, making Miller's termination notices invalid. Miller counterclaimed, seeking a declaratory judgment to the contrary.

On the parties' cross-motions, the District Court granted summary judgment to Miller, relying primarily on two conclusions. *Horror Inc.*, 335 F. Supp. 3d at 320-21. First, it held that Miller did not prepare the Screenplay as a work for hire, making Miller the "author" of the Screenplay and entitled to terminate Manny's and Horror's rights. *Id.* at 311. Second, the District Court concluded that Miller's termination notice was not untimely under the Copyright Act's three-year statute of limitations. *Id.* at 314, 317.[5]

Manny and Horror now appeal.

## STANDARDS OF REVIEW

We review *de novo* a district court's award of summary judgment. *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 254 (2d Cir. 2015). Summary judgment is appropriate when

---

to Manny. *See id.* at 99 (Miller's "Flat Deal Contract" with Manny). Manny then sold "all the literary, dramatic, . . . motion picture, radio and television, . . . and commercial exploitation rights in the Screenplay" to Georgetown. *Id.* at 120 (Manny's Agreement with Georgetown). Georgetown registered a copyright for the "motion picture photoplay" claiming authorship over "the entire work," including "the Screenplay . . . and other literary and cinematographic materials." *Id.* at 400-01 (Georgetown's copyright registration). Horror is Manny's most recent successor-in-interest. Therefore, if Miller is the "author" of the Screenplay—and if the Screenplay is not a "work made for hire"—then section 203 of the Copyright Act authorizes Miller to terminate Manny's and Horror's rights in the Screenplay.

[5] The District Court also considered and rejected Manny and Horror's argument that, "outside of the work-for-hire analysis, Cunningham's and Scuderi's participation in the screenwriting process . . . otherwise qualif[ied] them either to deprive Miller of authorship status or to share authorship of the screenplay with Miller." *Horror Inc.*, 335 F. Supp. 3d at 311. It concluded that Miller is the "sole author" of the Screenplay. *Id.* at 311-14. Manny and Horror do not contest this conclusion on appeal.

the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (explaining that a plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment). When ruling on a summary judgment motion, the court construes the evidence before it in the light most favorable to the nonmoving party and resolves all ambiguities and draws all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a motion for summary judgment is supported by documentary and testimonial evidence, the nonmoving party may not rest upon mere allegations or denials—rather, he must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," then summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.[6] To present a "genuine" issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

We review *de novo* "[t]he District Court's ultimate determination as to whether a worker is an employee or an independent contractor—that is, the District Court's balancing" of the thirteen factors established in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) ("*Reid*"), for assessing whether in the copyright context a work was prepared as a work made for hire. *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 115 (2d Cir. 2000). Because a "work made for hire" is a statutory

---

[6] Unless otherwise noted, in quoting caselaw, this Opinion omits all alterations, citations, footnotes, and internal quotation marks.

11

exception to the general rule of author-ownership of copyright, the party claiming the exception bears the burden of proving that the exception applies. *Woods v. Bourne Co.*, 60 F.3d 978, 993-94 (2d Cir. 1995).

The Copyright Act provides expressly that the facts stated in a copyright registration are entitled to a presumption of validity. 17 U.S.C. § 410(c).[7] "The statutory presumption is by no means irrebuttable, but it does order the burden of proof." *Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*, 160 F.3d 106, 111 (2d Cir. 1998), *amended*, 169 F.3d 782 (2d Cir. 1998).

"The application of a statute of limitations presents a legal issue and is also reviewed *de novo*." *Brennan v. Nassau Cnty.*, 352 F.3d 60, 63 (2d Cir. 2003).

## DISCUSSION

I.    **Was Miller an "employee" of Manny or an "independent contractor" under the Copyright Act?**

On appeal, Manny and Horror claim that Miller prepared the Screenplay as an "employee" of Manny. (For convenience, we refer to them as "the Companies," distinguishing between them only as necessary.) Thus, the Companies contend, the Screenplay was a "work for hire" and Miller cannot exercise his termination rights under section 203(a). The Companies press three main arguments in support of this conclusion.

---

[7] "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c).

First, without addressing the *Reid* factors, the Companies assert that the district court erred in interpreting "employee" under the Copyright Act in a manner that is in meaningful conflict with the National Labor Relations Act, *see* 29 U.S.C. §§ 151, *et seq.* Appellants' Br. at 28. The Companies propose that Miller's WGA membership "inherently" created an employer-employee relationship between Manny and Miller, independent from the *Reid* framework. Appellants' Br. at 25. The Companies' efforts to "harmonize" the Copyright Act and NLRA are misguided, and we reject their proposed construction of copyright law. Appellants' Br. at 30.

Second, the Companies posit that even if Miller's WGA membership is not dispositive of the question whether Miller is an "employee" under copyright law and the *Reid* factors apply in full force, the District Court erred in its *Reid* analysis because it should have considered the WGA collective bargaining agreement as an additional factor.

Finally, the Companies also contend that the District Court erred in balancing the existing *Reid* factors by failing to assign "great weight" to Miller's membership in the writers' union (the WGA) and Manny's participation in a collective bargaining agreement with the WGA, Appellants' Br. at 36, as well as by resolving "numerous" triable issues of fact regarding the *Reid* factors' application in Miller's favor, *id.* at 54.

We discuss each contention in turn below.

A.    Copyright law, not labor law, controls the "work for hire" determination here

The Companies first invoke the definition of "employee" that prevails in the labor law context in an attempt to permit that context to determine the analysis of the work-for-hire, employer-employee relationship doctrines under the Copyright Act. Their attempt misses the mark. We conclude that because the definition of "employee" under copyright law is grounded in the common law of agency and the *Reid* framework

13

and serves different purposes than do the labor law concepts regarding employment relationships, there is no sound basis for using labor law to override copyright law goals. The Companies' arguments to the contrary are unpersuasive.

(1) *The concept of "work for hire" under the Copyright Act*

The Constitution empowers Congress to "promote the . . . useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings." U.S. Const. art. I, § 8, cl. 8. In the Copyright Act of 1976, Congress acted on that power. *See* 17 U.S.C. §§ 101, *et seq.* The Act provides that copyright ownership "vests initially in the author or authors of the work." *Id.* § 201(a). Long-established precedent designates "the author" as the person who "actually creates the work—that is, the person who translates an idea into a fixed, tangible expression," making the work copyrightable. *Reid*, 490 U.S. at 737; *see also Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 107 (2d Cir. 2002); *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir. 1976). Ownership confers a panoply of rights, including the right to sell; to license, exclusively or non-exclusively; to make derivative works; to perform (for those works amenable to performance); and generally, to control and shape uses permitted to others. *See* 17 U.S.C. § 106 ("Exclusive rights in copyrighted works"). The author is presumptively a work's owner. *Id.* § 201(a). During certain time windows, the author may recover a copyright that he has transferred. *Id.* §§ 203(a), 304(c).

The Act creates an exception to the general authorship rule regarding "works made for hire": as to those works, "the employer or other person for whom the work was prepared is considered the author," *id.* § 201(b), and the original creator has no corresponding termination right, *id.* § 203(a).[8] Generally, the party relying on the work-

---

[8] We will use "work for hire" interchangeably with "work made for hire." *See Reid*, 490 U.S. at 737 n.3; *see also* 17 U.S.C. § 101.

for-hire exception bears the burden of demonstrating that it applies. *Woods*, 60 F.3d at 993-94; *see generally F.T.C. v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948) ("[The] general rule of statutory construction that the burden of proving justification or exemption under a special exception to . . . a statute generally rests on one who claims its benefits . . . .").

Section 101 of the Act defines two mutually exclusive categories of work for hire: the first provides that a work made by an employee within the scope of his employment is a work for hire; and the second provides that a specially commissioned work that is subject to an express agreement that the work will be treated as one made for hire is such a work. 17 U.S.C. § 101; *see Reid*, 490 U.S. at 738. The Companies concede, as they must, that the Screenplay does not qualify under the "specially commissioned work" definition: although the parties entered into a written agreement, the WGA form contract that they signed does not provide that the Screenplay is a work for hire. They thus did not expressly agree to its treatment as such, and it is not a specially commissioned work. The Companies' appeal thus centers on whether Miller was "writing within the scope of the employment" as Manny's "employee" when he composed the Screenplay.

In 1980, Georgetown registered the copyright in the Screenplay, designating it in the Copyright Office form as "a work made for hire." App'x at 400. As explained above, section 410(c) of the Act creates a statutory presumption of validity for facts set forth in a copyright registration document. The Companies are thus entitled to a statutory presumption that the Screenplay was indeed a work for hire. That presumption, however, is rebuttable, *see Langman Fabrics*, 160 F.3d at 111, and, for the reasons set forth below, we conclude that it was rebutted here.

(2) *The* Reid *framework and factors*

Although it uses the terms "employee," "employment," and "scope of employment" in critical provisions, the Copyright Act defines none of the three; consequently, "the application of these terms is left to the courts." *Aymes v. Bonelli*, 980 F.2d 857, 860 (2d Cir. 1992). In *Reid*, the Supreme Court created an enduring framework for distinguishing between an employee and a non-employee author in matters of copyright.[9] 490 U.S. at 751-53.

Relying on the statutory language and legislative history of section 101, the Supreme Court explained in *Reid* that in using these terms Congress "intended to describe the conventional master-servant relationship as understood by common-law agency doctrine," and thus courts should "rel[y] on the general common law of agency" to determine whether the individual is an employee or an independent contractor. *Id.* at 740. Thus, if the individual qualifies as an employee "under the general common law of agency," *id.* at 751, and the work is prepared within the scope of his employment, *id.* at 738, then the work that he prepares for his employer is a work for hire. If, however, the individual is merely an independent contractor "as understood by common-law agency doctrine," *id.* at 740, then the work will not qualify as a work for hire under section 101.

To aid in this inquiry, *Reid* identified thirteen non-exhaustive factors: (1) the hiring party's right to control the manner and means by which the work is accomplished; (2) the skill required to create the work; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign

---

[9] Although *Reid* was decided roughly ten years after the creation of the Screenplay, the parties agree that—insofar as Miller's WGA membership is not dispositive to the dispute—the *Reid* framework governs here.

additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; (13) the tax treatment of the hired party. *Id.* at 751-53. "Other relevant factors may also be considered, so long as they are drawn from the common law of agency that *Reid* seeks to synthesize." *Eisenberg*, 237 F.3d at 114 n.1.

### (3) *Relevance of labor law under the* Reid *analysis*

The Copyright Act and the NLRA serve altogether different purposes and focus on different economic sectors. *Compare* 29 U.S.C. § 151 (stating purpose of NLRA is to mitigate and eliminate obstructions to the free flow of commerce "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection") *with Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526-27 (1994) (explaining that "copyright law ultimately serves the purpose of enriching the general public through access to creative works"). For that reason, it should not be surprising that they rely on different conceptions of the employment relationship.

As the Supreme Court explored extensively in *Reid*, section 101 of the Copyright Act uses a more restrictive definition of employment, one aimed at limiting the contours of the work-for-hire determination and protecting authors—the individual creators of works whose foundational value the Constitution itself recognizes and Congress has expounded upon. 490 U.S. at 737-52; *see also* U.S. Const. art. I, § 8, cl. 8. In the labor and employment law context, in contrast, the concept of employment is broader, adopting a more sweeping approach suitable to serve workers and their collective bargaining

interests and establishing rights (in the NLRA), their safety rights (in the Occupational Safety and Health Act, 29 U.S.C. §§ 651, *et seq.*), and pay rights (in the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*), for example.[10]

The Companies ask this court, however, to give dispositive weight to the determination of the National Labor Relations Board that screenplay writers are "employees" of production companies under the NLRA and that they therefore may unionize. *In re Metro-Goldwyn-Mayer Studios*, 7 N.L.R.B. 662 (1938) ("*MGM*"). In *MGM*, the NLRB determined that the screenwriters who formed the Screen Writers Guild (the WGA's predecessor) were "employees" under the NLRA, thus entitling them to unionize. *Id.* at 690.[11] As a result, the WGA was later able to negotiate the MBA on behalf of its writers. The minimum terms and conditions of the MBA were, in turn, incorporated into the "Writer's Flat Deal Contract" that Miller and Manny signed some forty years later.

---

[10] *See, e.g.*, *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324-25 (1992) (explaining that courts have traditionally "read 'employee' [under the NLRA and Social Security Act] to imply something broader than the common-law definition" such that Congress, in response, "amended the [NLRA and Social Security Act provisions] so construed to demonstrate that the usual common-law principles were the keys to [their] meaning"); *Frankel v. Bally, Inc.*, 987 F.2d 86, 89 (2d Cir. 1993) (explaining that, to determine whether an individual is an employee or an independent contractor for purposes of the FLSA, courts use the economic realities test; "[t]he common law agency test was . . . too restrictive to encompass the broader definition of the employment relationship contained in the [FLSA]"); *All Star Realty Co., Inc*, 24 O.S.H. Cas. (BNA) ¶ 1356 (No. 12-1597, 2014) (explaining that "[t]he [Occupational Safety and Health Review] Commission utilizes the 'economic realities test' . . . to determine whether an employer/employee relationship exists").

[11] The production companies in *MGM* argued that screenwriters were not within the category of "employees" that the NLRA was "intended" to protect. *MGM*, 7 NLRB at 686-87. After reviewing the employment practices and contractual agreements between screenwriters and the production companies, the Board concluded: "Upon the basis of all the evidence, we find that persons engaged by the respective Companies to perform services for them as screen writers are employees within the meaning of [section 2(3), 29 U.S.C. § 152(3), of the NLRA]," and were therefore entitled to the NLRA's protections. *Id*. at 690.

The Companies insist that Miller's relationship with Manny is one of employment for *all* purposes, entered into by a WGA member (Miller) and a WGA signatory employer (Manny). The employment relationship was defined at its inception, they urge, by the terms and conditions of the applicable WGA-multi-employer collective bargaining agreement (the MBA). They argue the existence of the WGA and its attendant collectively bargained-for protections "inherently creates an employment [relationship]" between Manny and Miller, "and not an independent contractor relationship," such that our case law's application of the *Reid* factors is unnecessary. Appellants' Br. at 25.

But under the Companies' proposed approach, Miller's employment status for copyright purposes would be dictated by labor law, not the common law of agency. This result stands in direct conflict with *Reid* and circuit precedent. *Reid*, 490 U.S. at 741 ("[T]he term 'employee' [under the Copyright Act] should be understood in light of the general common law of agency."); *Aymes*, 980 F.2d at 860 (explaining that when "determin[ing] whether a work is for hire under the [Copyright] Act, a court first should ascertain, using principles of the general common law of agency, whether the work was prepared by an employee or an independent contractor").

It is true that courts today may look to the common law of agency to determine whether an individual is an employee for NLRA purposes, *see NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968), or indeed for purposes of tax law, Title VI, or disability law, *see, e.g.*, *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (ERISA); *Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir. 1993) (ADEA); *Castellano v. City of New York*, 142 F.3d 58, 69 (2d Cir. 1998) (ADA); *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997) (Title VII). But the obverse is not necessarily true. The argument advanced by the Companies overlooks the fact that, in early days after the NLRA's passage, courts treated the NLRA's definition of "employee" as more expansive than the common law

definition. *See, e.g., NLRB v. Hearst Publ'ns, Inc.*, 322 U.S. 111, 124-25 (1944) (rejecting agency law conception of employee for purposes of the NLRA). It was only after Congress amended the NLRA in 1947 to specifically exclude independent contractors from the definition of employees—nearly a decade after the NLRB's decision in *MGM*— that courts began "apply[ing] general agency principles in distinguishing between employees and independent contractors under the [NLRA]." *United Ins. Co. of Am.*, 390 U.S. at 256.[12]

As we emphasized in *Eisenberg v. Advance Relocation & Storage, Inc.*, the factors relevant to determining an agency relationship are context-specific and implicate different considerations under different statutory schemes. The court's analysis of the facts for purposes of determining whether an individual is an "employee" will thus vary within different statutory schemes, even if the statutes and case law construing them all refer in some way to a common law concept of an "employee." *See Eisenberg,*

---

[12] In *NLRB v. United Insurance Co. of America*, the Supreme Court explained:

> Initially this Court held in [*NLRB v. Hearst Publications*, 322 U.S. 111 (1944)], that "Whether . . . the term 'employee' includes (particular) workers . . . must be answered primarily from the history, terms and purposes of the legislation." [*Id.* at 124]. Thus the standard was one of economic and policy considerations within the labor field. Congressional reaction to this construction of the Act was adverse and Congress passed an amendment specifically excluding "any individual having the status of an independent contractor" from the definition of "employee" contained in [the NLRA]. The obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the [NLRA] . . . . Thus there is no doubt that we should apply the common law agency test here in distinguishing an employee from an independent contractor.

390 U.S. at 256 (summarizing 1947 amendment and citing legislative history).

237 F.3d at 116, 119 (holding that warehouse worker was an "employee," not independent contractor, of warehouse company, and therefore was entitled to protections of Title VII and New York State Human Rights Law).

In *Eisenberg*, we declined to use the same "weighing of the *Reid* factors" that we had developed in the copyright context to determine whether an individual qualified as an "employee" under Title VII. *Id.* at 116. Instead, it adopted a different weighting scheme, one tailored to achieve the anti-discrimination purposes of Title VII. *See id.* at 117. We explained that, while it "may make sense in the copyright work-for-hire context" to place a special emphasis on "the benefits and tax treatment factors," courts should not do so "in anti-discrimination cases" and "should instead place special weight on the extent to which the hiring party controls the 'manner and means' by which the worker completes her assigned tasks." *Id.* In short, the suitable application of the common law of agency can be expected to vary from one legal regime to another.[13]

The Companies identify no sound basis for jettisoning this court's precedent and expanding copyright law's concept of "employment" to mirror one adopted by those labor and employment statutes. The NLRB's 1938 *MGM* decision marked an important development for screenwriters, no doubt, but the Companies have pointed to nothing establishing that the work-for-hire provision and termination right in section 203 of the 1976 Copyright Act were intended to be subordinate to the right of screenwriters to

---

[13] The Companies cite to *Nationwide Mutual Insurance Co. v. Darden* for the proposition that the "same definition of 'employee' used in *Reid* under the Copyright Act applies to both the NLRA and ERISA." Appellants' Br. at 29. However, *Darden* merely reiterated the presumption in *Reid* that "Congress means an agency law definition for 'employee' unless it clearly indicates otherwise." 503 U.S. at 325. Thus, *Darden* does not undermine our conclusion that the common law of agency articulated in *Reid*, and not the broader construction of "employee" under the NLRA, applies to the Copyright Act.

collectively bargain as employees for NLRA purposes. Indeed, the MBA in effect when Miller contracted with Manny and Cunningham was silent as to work-for-hire status. Given the designation's "profound significance," we cannot find such a provision to be implicit in the agreement. *Reid*, 490 U.S. at 737.

That labor law was determined to offer labor protections to independent writers does not have to reduce the protections provided to authors under the Copyright Act. That Miller was a WGA member and Manny an employer covered by the MBA when Miller agreed to write the Screenplay, does not in and of itself establish an employment relationship between the two for Copyright Act purposes.

*Reid*, *Eisenberg*, and *Aymes* make clear that, regardless of Miller's employment status under the NLRA and his membership in the WGA we must independently determine whether Miller is an employee under section 101 of the Copyright Act and must rely on general common law principles of agency, as interpreted in copyright-context case law, to guide our analysis. *Reid*, 490 U.S. at 740 ("[W]e have relied on the general common law of agency . . . ."); *see also Eisenberg*, 237 F.3d at 114 n.1 ("Other relevant factors may also be considered . . . so long as they are drawn from the common law of agency that *Reid* seeks to synthesize."); *Aymes*, 980 F.2d at 860 ("[T]o determine whether a work is for hire under the [Copyright] Act, a court first should ascertain, using principles of the general common law of agency, whether the work was prepared by an employee or an independent contractor."). The District Court correctly set aside NLRA-based doctrine in favor of common law principles and the *Reid* factors in analyzing whether Miller was Manny's "employee" for purposes of this dispute.

B.    The WGA Collective Bargaining Agreement as an additional *Reid* factor

The Companies' second theory is that even if Miller's WGA membership is not dispositive, and even if the *Reid* framework applies in full force, union membership should be considered as an additional factor. The Companies assert that Miller's union

membership warrants such treatment largely because it is evidence of the screenwriter community's general belief and expectation that, following the decision in *MGM* and the entry into the MBA, screenwriters would be hired by studios and producers as employees, not independent contractors. The Companies stress that, according to the Restatement (Second) of Agency, "community custom in thinking that a kind of service . . . is rendered by servants, [as opposed to independent contractors,] is of importance" in determining whether an employer-employee relationship exists under the common law of agency. Restatement (Second) of Agency § 220, cmt. m (1958). Here, the Companies suggest, screenwriters expected to be treated as employees and desired to obtain the benefits accorded employees under the NLRA and otherwise.

In support of this narrative, the Companies highlight a report prepared on their behalf for this litigation,[14] advising that, "even absent a written agreement, under the custom and practice in the industry, writing performed with the knowledge and consent of a [WGA] signatory employer is treated as writing under employment covered by the [MBA]." Appellants' Br. at 38.

This argument, however, is simply another attempt to shift *Reid*'s analytic focus from agency law to labor law and convince us the labor law framework governs here. The essence of the assertion is that, because "community custom" evidence suggests that the screenwriter community as a whole expected to be treated as employees for collective-bargaining purposes, they also expected to be treated as employees for copyright purposes. Nothing in the record, however, suggests that any such community

---

[14] The report was prepared by William Cole, a labor law attorney, who was proffered as an expert in the history of labor relations in the film industry. *See* App'x at 131 (explaining that Cole prepared the report to address "how the WGA and companies signatory to the WGA Basic Agreement have historically treated literary material written for theatrical motion pictures"). Miller objected to the report's admission into evidence. The District Court did not rely on the report in its analysis.

expectations about the MBA's coverage reflected anything more than the writers' understanding of existing labor law and their desires to use that regime to their advantage in an industry where they typically have little individual bargaining power.

Relatedly, the Companies contend that because Miller's status as an "employee" in the labor law context entitled him to certain benefits under the WGA that shaped his relationship with Manny—such as allowing him to work from home, receive lump sum payments, and contract with Manny on a project-to-project basis—he cannot, having received those benefits, now claim that he is an "independent contractor" for copyright purposes. However, that Miller's employee status as *a screenwriter* entitled him to certain protections for the purposes of *labor law* (such as the collectively bargained for protections under the MBA) does not preclude him from being considered an "independent contractor" and receiving the very different protections afforded to *authors* under *copyright law*. *Reid* instructs us to look at the overall context of the parties' relationship based on our overview of specific factors. 490 U.S. at 751-53. While Miller's WGA membership may play a role in shaping his relationship with the Companies, it does not alter or control our analysis of the *Reid* factors for copyright purposes.

Accordingly, we locate no error in the District Court's refusal to treat Miller's WGA membership as a separate *Reid* factor.

C.     Applying the *Reid* factors

The Companies' next argument is a variation of the previous one. They contend that, even if Miller's WGA membership is not dispositive and the existing *Reid* factors provide the correct framework for analyzing Miller's status, the District Court erred in its application of the existing *Reid* factors by, first, failing to give "great weight" to Miller's union membership in the court's analysis of the existing *Reid* factors, Appellants' Br. at 36, second, misallocating the burden of proof regarding the effect of

24

Georgetown's copyright registration, and, third, construing certain facts in favor of Miller rather than the Companies. We are not persuaded.

We have cautioned against applying the *Reid* factors "in a mechanistic fashion." *Aymes*, 980 F.2d at 862. Courts can "easily misappl[y]" the *Reid* test because *Reid* merely provided "a list of possible considerations that may or may not be relevant in a given case" and gave "no direction concerning how the factors were to be weighed." *Id.* at 861. Thus, "[i]n balancing the *Reid* factors," courts must take care to "disregard those factors that, in light of the facts of a particular case, are (1) irrelevant or (2) of indeterminate weight—that is, those factors that are essentially in equipoise and thus do not meaningfully cut in favor of either the conclusion that the worker is an employee or the conclusion that he or she is an independent contractor." *Eisenberg*, 237 F.3d at 114.

In *Aymes*, we provided additional guidance on the *Reid* analysis.[15] In that case, while assessing whether the plaintiff was an "employee" under section 101, we flagged five core considerations that "will almost always be relevant [to the *Reid* analysis] and should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship." *Aymes*, 980 F.2d at 861. Those factors are: "(1) the hiring party's right to control the manner and means of creation; (2) the skill required [of the hired party]; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party." *Id.*

As explained above, we review *de novo* "[t]he District Court's ultimate determination as to whether a worker is an employee or an independent contractor." *Eisenberg*, 237 F.3d at 115. Also as noted, the Companies bear the burden to prove that

---

[15] As we later observed in *Eisenberg*, the special emphasis that *Aymes* placed on certain *Reid* factors is specific to "the copyright context" and does not necessarily extend to other areas of law. *Eisenberg*, 237 F.3d at 116.

the "work made for hire" exception to the general rule of author-ownership applies. *Woods*, 60 F.3d at 993-94.

Our analysis must take into due account, however, that Georgetown (Horror Inc.'s predecessor-in-interest) filed a copyright registration for the Screenplay that explicitly identified the Screenplay as a work for hire, a fact that entitles the Companies to a rebuttable statutory presumption that the Screenplay was a work for hire. *Langman Fabrics*, 160 F.3d at 111; *see also* 17 U.S.C. § 410(c). The strength of Miller's position as an independent contractor in our analysis of the *Reid* factors is sufficient to rebut the statutory presumption here.

As a threshold matter, we reject the Companies' proposition that Miller's WGA membership was entitled to "great weight." Appellants' Br. at 36. Because we decline to treat union membership as a separate *Reid* factor, *see* Section I.B, *supra*, Miller's membership is relevant only insofar as it informs our analysis of other factors, namely whether Miller received benefits commonly associated with an employment relationship. *Langman Fabrics*, 160 F.3d at 111.[16] Union membership signals that certain aspects of the economic relationship between two parties may be arrived at through the collective bargaining process. It has no independent weight at all in the *Reid* analysis.

------

[16] Contrary to the Companies' assertions, the District Court did consider Miller's union membership to be relevant under its *Reid* analysis. *See, e.g.*, *Horror Inc.*, 335 F. Supp. 3d at 290 ("Manny did not provide Miller with any traditional employee benefits, and failed to even make the contributions to WGA health care or pensions plans required under the MBA that Manny and Horror so heavily rely on."); *id.* at 307 ("[T]he applicable collective bargaining agreement contemplates both circumstances in which a writer would agree to work on a project-by-project basis and circumstances in which a writer would agree to work for a fixed period of time."); *id.* at 310 ("[E]ven though the MBA declares that a writer's working from home shall be deemed 'at the request of and for the convenience of the employer', those magic words cannot erase the agency-law consequences of Miller's work from home, using mainly his own tools."). On *de novo* review, we reach similar conclusions in conducting our *Reid* analysis below.

We again decline the Companies' invitation to import a labor law framework into the analysis when our inquiry is guided by the common law of agency.

Viewing the evidence in the light most favorable to the Companies, and having presented it as such above, we conclude as a matter of law based on the undisputed facts that Miller worked as an independent contractor when he produced the Screenplay. Below, we consider the *Reid* factors that are key to our analysis.

### 1. Control

In light of the close working relationship that without a doubt existed between Cunningham and Miller—who frequently met at each other's homes to discuss the film and bounce ideas off one another—it is difficult to develop a clear picture regarding whether Manny maintained the "right to control the manner and means of creation" for *Friday the 13th*. Viewing the facts in the light most favorable to the Companies, we conclude that, on balance, the right-to-control factor tips slightly in the Companies' favor.

Taken in the Companies' favor, the evidence suggests that Cunningham's involvement reflected limited control over Miller's creative process—tutoring him on the elements of horror films, working in proximity with Miller and occasionally looking over Miller's shoulder during drafting, and selecting or rejecting certain creative ideas, such as the setting and title of the film. Cunningham averred that he frequently met with Miller "to develop scenes and discuss ideas for the Screenplay"; that he was involved in the development of all "scenes, concepts, characters, elements, themes [and] plots in the Screenplay"; and that in an unspecified number of instances, he "dictated" an unknown number of unspecified changes for Miller to make to the Screenplay. App'x at 638. This depiction suggests that Cunningham was involved in the development of the Screenplay and exercised at least some control over the drafting process.

Yet, as the District Court observed, "few of the examples of Cunningham's control adduced by [the Companies] rise above the level of the sort of big picture approval authority and general suggestions that do not weigh heavily in favor of a right to control." *Horror Inc.*, 335 F. Supp. 3d at 303; *see also Marco v. Accent Pub. Co.*, 969 F.2d 1547, 1551-52 (3d Cir. 1992) (discounting the importance of the hiring party's right to control, in a case involving a copyright dispute over photographs, where the party "controlled only the subject matter and composition of the images" and "did not control most aspects of the work, which include the choice of light sources, filters, lenses, camera, film, perspective, aperture setting, shutter speed, and processing techniques"), *abrogated on other grounds by TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019). The closest that Cunningham comes to describing detailed control over Miller's writing process such as would ascribe heavier weight to this factor is his testimony that he "[s]ometimes . . . stood over [Miller's] shoulder making suggestions and contributions" while Miller wrote. App'x at 638. Even crediting this assertion, however, Cunningham's "suggestions and contributions" do not necessarily evince the type of comprehensive control that characterizes a traditional employer-employee relationship. *Horror Inc.*, 335 F. Supp. 3d at 304. Instead, that Cunningham made "suggestions and contributions" is more consistent with Miller's description of the screenwriting process as a non-hierarchical, "creative collaboration and exchange of ideas" between himself and Cunningham.[17] *Id.*

Indeed, Scuderi's alteration of the Film's closing scene provides the only specific instance identified by the Companies in which the Screenplay was altered over Miller's

---

[17] Although Cunningham avers generally that he "insisted Miller include certain scenes and changes that were dictated by [Cunningham]," App'x at 638, he provides no specifics. Moreover, even if he did direct the inclusion of some material from time to time, that fact without more does not change our assessment.

28

objections. Yet Scuderi's alteration is not probative of any employer-employee relationship between Miller and *Manny* because Scuderi neither worked for Manny nor was otherwise Manny's agent and Georgetown was not formally involved in the project until a year or more after the Screenplay was finished.

We note also that the Companies abandoned any claim to dual authorship of the Screenplay with Miller, who was credited exclusively as the screenwriter, implicitly reflecting that their suggestions and contributions were not sufficiently material to amount to "control" over the Screenplay.

Thus, if the evidence in the record regarding "control" weighs in favor of finding that Miller was Manny's employee, it does so only marginally.

### 2. Skill

The undisputed record establishes that Miller used his expertise and creativity to write the Screenplay. The parties do not dispute that Miller was working as a screenwriter beginning well before 1979. And Miller had already received a graduate degree studying theatre and had "written several published novels and the screenplays for three produced films." App'x at 421.

Courts adjudicating copyright cases involving professional creative artists have typically found the skill factor to weigh strongly in favor of independent contractor status.[18] The Companies do not contest, nor could they, that screenwriting is a skilled profession and that Miller was a skilled screenwriter. Instead, they try to downplay the importance of Miller's general skill, arguing that his skill should be discounted because (1) he had "minimal expertise in writing *horror* films," and (2) Cunningham, by contrast, had some experience in the horror genre. Appellants' Br. at 43. Neither point is particularly persuasive.

---

[18] *See, e.g., Reid*, 490 U.S. at 752; *Aymes*, 980 F.2d at 862; *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 86-87 (2d Cir. 1995).

We recognized in *Aymes* that those in professions akin to that of "architects, photographers, graphic artists, drafters" are often found by courts "to be highly-skilled independent contractors." 980 F.2d at 862. Like the computer programmer in *Aymes*, Miller "use[d] skills developed while a graduate student . . . and through his experience working" on other films. *Id. Aymes* also makes clear that the court should focus on the "skill[s] necessary to perform the work," rather than relying on "relative youth and inexperience." *Id.* Here, the evidence shows that Cunningham was familiar with the horror genre, but that he required Miller's creativity and screenwriting experience to prepare and complete the Screenplay. Miller did not "merely transcrib[e] [Cunningham's] instructions" when generating the treatment and Screenplay, *id.*, and, contrary to the Companies' assertions, Cunningham's contributions—such as "rewriting, revising and restructuring the treatment"—did not "prove[] his ability" to do the creative work as a screenwriter, Appellants' Br. at 43. Construing the facts in the light most favorable to the Companies, we think it fair to conclude that although Cunningham contributed to the drafting effort, he ultimately relied on Miller's expertise to craft the Screenplay. Thus, under these circumstances, any skill of the hiring party in the field needed to create the work was eclipsed by the skill of the hired party and thus does not weigh in favor of treating Miller as an employee. *Langman Fabrics*, 160 F.3d at 113 (explaining that, even when control factor weighs in employer's favor, "[t]he level of skill required of the hired person weighs in favor of independent contractor status" when the hiring party "hired the artist because he himself could not" perform the creative task (drawing)).

Accordingly, the skill factor "weighs in favor of Miller's status as independent contractor." *Horror Inc.*, 335 F. Supp. 3d at 305.

30

### 3. *Employee benefits*

The record shows that Manny never provided Miller with health insurance, paid vacation time, worker's compensation benefits, a pension plan, or other types of benefits that courts have traditionally found probative of employee status. *See Reid*, 490 U.S. at 753 (examining contributions to unemployment insurance or workers' compensation funds); *Aymes*, 980 F.2d at 862 (reviewing health insurance, unemployment, and life insurance); *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 86-87 (2d Cir. 1995) (considering life, health, liability insurance, and paid vacations).

The Companies attempt to avoid the force of this observation by recasting the benefits that were established by the MBA as "traditional" employee benefits. Appellants' Br. at 44-45. They highlight that the MBA gave Miller rights to preview the Film before public release, to receive residual and sequel payments on the Screenplay, to receive appropriate on-screen credit, and to WGA representation as needed to obtain such collectively bargained-for benefits.

Again, reviewing the evidence in the Companies' favor, we are unable to conceive of any of these as traditional employee benefits. Indeed, their availability through the WGA form only puts into stark relief the *absence* of benefits such as health insurance, life insurance, and disability insurance that the traditional employment relationship ordinarily entails. *See, e.g.*, *Reid*, 490 U.S. at 753; *Aymes*, 980 F.2d at 862; *Carter*, 71 F.3d at 86-87.

Deferred compensation in the form of sequel or residual payments carries substantial uncertainty and risk. It does not align with typical employee benefits. The Companies point to no instance of its recognition by any court as such. As a counter, the Companies point to the statement that appeared in their 1987 settlement agreement resolving disputes with Miller about such payments that refers to "all sums due Miller." App'x at 410. They suggest that, in light of the record, this language could reasonably

be interpreted as conferring on him traditional employee benefits—an interpretation that we find implausible. Moreover, that such a settlement was made years after Miller's work on the Screenplay, does not address whether, during the months when Miller was working on the Screenplay, Manny actually provided any typical benefits to Miller, and it certainly does not transform the lump-sum settlement payment into "traditional benefits." App'x at 410.[19]

In *Aymes*, this court gave special weight to the fact that the hiring party did not pay traditional employment benefits, reasoning that it would be inequitable for a hiring party to benefit from a worker's status as an independent contractor "in one context" and then "ten years later deny [the worker] that status to avoid a copyright infringement suit." 980 F.2d at 862. The Companies cannot have it both ways.

In sum, because Manny did not provide Miller any traditional employee benefits, the employee benefits factor weighs heavily in Miller's favor.

### 4. Tax treatment

This court has held that the parties' tax treatment of their relationship is, along with employee benefits, "highly indicative" of whether a worker should be treated as a conventional employee for copyright purposes. *Id.* Other circuits are in accord.[20]

---

[19] The Companies also mention that, under the MBA, Miller was entitled to receive "[p]ension, health, and welfare benefits provided by the WGA's ERISA plans, to which Manny was required to contribute in an amount equal to 9% of Miller's salary." Appellants' Br. at 44. The parties dispute whether Manny ever actually made the requisite contributions to Miller's ERISA plan. The Companies dismiss any lack of payment by Manny as irrelevant because (as Miller acknowledges) he ultimately received benefits under the WGA's ERISA plan and the settlement Miller received "represents all sums due Miller." *Id.* at 46; App'x at 410. Either way, the record is clear that Manny did not pay "traditional benefits" to Miller, thus Manny's alleged lack of contributions do not constitute a material fact in dispute.

[20] *See, e.g.*, *Hi–Tech Video Prods., Inc. v. Cap. Cities/ABC, Inc.*, 58 F.3d 1093, 1097 (6th Cir. 1995) ("[A] strong indication of a worker's employment status can be garnered through examining how the employer compensates the worker (including benefits provided) and how the

Miller averred that Manny never withheld or deducted any taxes, social security, Medicare, or other comparable amounts from his compensation and that his compensation was paid precisely as designated in the two-page form agreement: one payment of $5,569 on completion of the first draft of the screenplay, and a second payment of $3,713 upon final submission. He corroborated this testimony with documentary evidence, in particular, a signed letter from Cunningham dated August 22, 1979, stating the following: "Enclosed please find a check in the amount of $3,713.00 per our agreement." App'x at 604. The amount ($3,713) is noteworthy because it is the exact amount owed to Miller under the Writer's Flat Deal Contract for completing the final draft Screenplay. That the figures match exactly what was provided in the Contract is evidence that Manny did not deduct any taxes or other employment-related taxes from Miller's compensation. Cunningham's testimony comports with that conclusion: he stated that he did not recall withholding taxes for Miller. His recollection was also that he did not file any tax returns each year for Manny.

For their part, the Companies offer no evidence that could reasonably be understood as implying that Manny treated Miller as an employee for tax purposes. Instead, they attack the sufficiency of Miller's evidence: they assert that Miller has produced no "direct evidence of tax treatment" because he did not provide the actual check for $3,713—even though he produced a cover letter enclosed with the check—and none reflecting "how the initial payment of $5,569 was treated for tax purposes." Appellants' Br. at 47.

---

employer treats the worker for tax purposes."); *Jou v. Accurate Rsch., Inc.*, 73 F. App'x 964, 966 (9th Cir. 2003) ("Most compellingly, Plaintiff did not treat the programmers as 'employees' for tax purposes.").

No reasonable jury could conclude on this evidentiary record that Miller was treated as an employee for tax purposes; the only evidence is to the contrary.[21]

Thus, because the Companies failed to raise an issue of material fact as to whether Manny withheld some of Miller's compensation for tax purposes, the tax-treatment factor weighs in favor of Miller's independent contractor status.

### 5. Additional projects

When parties dispute whether a work was created by an individual as an employee or as an independent contractor, *Reid* tells us that examination of whether a hiring party had the right to assign additional projects is instructive because an independent contractor's engagement is more likely to be "project-by-project," *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998), with the relationship terminating upon completion of the contractually assigned project. *Reid*, 490 U.S. at 753; *see Aymes*, 980 F.2d at 863 ("[I]ndependent contractors are typically hired only for particular projects."). A traditional employee, on the other hand, will typically be hired to create not just a single artistic project, but will instead be subject to the employer's right to assign additional and distinct projects during the term of the engagement. *See Carter*, 71 F.3d at 86.

The record evidence and the terms of the Contract are devoid of any suggestion that Manny could assign additional projects to Miller. The Contract describes the job that it covers as "all of the writing necessary to complete the final screenplay," no more, no less. App'x at 100. The compensation amounts and Miller's undertaking concern "a complete and finished screenplay," not more than one or any other item. *Id.* at 99.

---

[21] Nor does the Companies' attack on the sufficiency of Miller's tax-treatment-related evidence preclude summary judgment: the "mere existence of *some* alleged factual dispute between the parties" is not enough. *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," and "[c]onclusory allegations will not suffice to create a genuine issue." *Id.*

It is apparent from the record evidence that Manny hired Miller solely to write the screenplay for a single movie: *Friday the 13th*. Nothing in the "Writer's Flat Deal Contract" gave Manny the right to assign Miller anything more: indeed, its title states that it was one, single, "flat deal." *Id.*

Resisting this conclusion, the Companies attempt to re-frame Miller's drafting of the Screenplay as comprised of a series of discrete projects. They propose, for example, that Cunningham assigned Miller "additional tasks," such as "com[ing] up with ideas for settings," "master[ing] the key strategies for horror film structure and success," and "writ[ing] scenes [Miller] did not like or want to write." Appellants' Br. 47.

It is true that Miller was called on to develop the Treatment as well as the Screenplay, but both were part and parcel of the single Film project. The Companies' argument mistakenly merges the right of final approval of a project (*i.e.*, the right to require Miller to deliver a screenplay to Manny's satisfaction) with the right to assign additional projects (*e.g.*, the right to require Miller to write a sequel to *Friday the 13th*). *See Marco*, 969 F.2d at 1551 ("Although the district court considered [defendant's] right to require [plaintiff] to reshoot unsatisfactory images, this right was merely a right to final approval, which differs from the right to assign more work."). Indeed, in *Reid* itself, the Supreme Court took a holistic approach to the development of a work of art, concluding that a non-profit organization had no right to "assign additional projects" to a hired sculptor within the meaning of this factor, even though the sculpting process involved several distinct phases of production, including making "sketches of [the] figures," acquiring the necessary materials, and then sculpting the material into the requisite figures. 490 U.S. at 734, 753.

Accordingly, this factor too weighs in favor of independent contractor status.

### 6. *Remaining factors*

The remaining *Reid* factors—*i.e.*, those that in *Aymes* we deemed less significant in the copyright context—on balance also favor treating Miller as an independent contractor.

*Duration*: Miller worked on the Screenplay for approximately two months. That the period was so brief weighs in Miller's favor. *See Reid*, 490 U.S. at 734, 752-53 (independent contractor status suggested by a complete working relationship of only six weeks); *Aymes*, 980 F.2d at 864 (finding duration to be an "inconclusive factor" where the parties worked together for two years, but "there were undisputed gaps in [the hired party's] employment").

*Method of payment*: Manny paid Miller $5,569 when he finished the first draft of the Screenplay and $3,713 when he finished the final draft. This method of payment—*i.e.*, a lump-sum payment that is "dependent on completion of a specific job"—is "a method by which independent contractors are often compensated." *Reid*, 490 U.S. at 753. This factor therefore weighs strongly in favor of classifying Miller as an independent contractor.

*Source of instrumentalities and tools*: As the District Court described, and the parties do not challenge, "Miller's primary work on the screenplay—the writing of the screenplay—was done using his own typewriter and paper." *Horror Inc.*, 335 F. Supp. 3d at 309. Yet, Miller also "used Cunningham's photocopier and copy paper and relied on Cunningham's secretary to re-type a draft of the screenplay." *Id.* Accordingly, this factor is neutral, and we disregard it. *Eisenberg*, 237 F.3d at 114.

*Location of work*: Miller worked primarily from his home, although he and Cunningham also frequently met "at each other's houses and in [Cunningham's] home office to discuss ideas and locations for the film." App'x at 90; *Horror Inc.*, 335 F. Supp. 3d at 311 (explaining that "Miller mainly used his own tools, and frequently worked

36

from home at his own pace"). Because Miller worked "primarily" from his home and at the time, neither of these workspaces—unlike an office building—was a traditional venue for conducting business, the location-of-work factor weighs slightly in Miller's favor.

*Discretion in setting schedule*: Cunningham set general deadlines for Miller to meet, "consistent with the pre-production and production schedule," App'x at 639, but Miller had significant freedom in scheduling his daily work hours—including, for example, choosing to do his writing primarily in the morning because he was a "morning person," *id.* at 423. Miller's discretion over his day-to-day schedule weighs in favor of classifying him as an independent contractor. *See Reid*, 490 U.S. at 753 ("Apart from the deadline for completing the sculpture, [sculptor] had absolute freedom to decide when and how long to work.").

*Hiring assistants*: The authority to hire assistants "will not normally be relevant [to the *Reid* inquiry] if the very nature of the work requires the hired party to work alone." *Aymes*, 980 F.2d at 861. Here, the Companies do not dispute that screenplay writing is generally solitary work. Nor do they resist the District Court's observation that "the nature of Miller's work [in writing the Screenplay] did not lend itself to the use of assistants" and "[t]here is no indication that Miller sought to hire any." *Horror Inc.*, 335 F. Supp. 3d at 311. Accordingly, this factor merits "no weight." *Aymes*, 980 F.2d at 861.

*Business entity*: Although Manny was a business, which is often consistent with having employee workers, this factor has "very little weight in [the *Reid*] analysis" *Id.* at 863. Here, it weighs only marginally in the Companies' favor.

*Business type:* That the type of Manny's business is producing screenplays for films and that Miller is a screenwriter weigh in favor of finding that Miller is an employee. *Id.* This factor accordingly favors employee status.

*7. Application of* Reid *factors, in summary*

Viewing them altogether, we have no difficulty in concluding that the *Reid* factors weigh decisively in favor of classifying Miller as an independent contractor. To review:

(1) *Control:* This factor weighs marginally in the Companies' favor;

(2) *Skill:* This factor weighs indisputably in Miller's favor;

(3) *Employee benefits:* This factor weighs in Miller's favor;

(4) *Tax treatment:* This factor weighs in Miller's favor;

(5) *Additional projects:* This factor weighs in Miller's favor;

(6) *Duration:* This factor weighs in Miller's favor;

(7) *Method of payment:* This factor weighs strongly in Miller's favor;

(8) *Source of instrumentalities and tools:* This factor carries indeterminate weight; thus, we disregard it.

(9) *Location of work:* This factor weighs marginally in Miller's favor;

(10) *Discretion in setting schedule:* This factor weighs in Miller's favor;

(11) *Hiring assistants:* This factor is not relevant here; thus, we disregard it;

(12) *Business entity:* This factor provides only marginal weight in the Companies' favor;

(13) *Business type:* This factor weighs in the Companies' favor.

The majority of the factors, including four of the five factors entitled to greater weight under *Aymes*, weigh decisively in Miller's favor. We therefore conclude that, under the *Reid* framework, Miller is an independent contractor, not an employee. Based on the strength of Miller's position under our application of the *Reid* factors, we also conclude that Miller has sufficiently rebutted the statutory presumption in favor of work-for-hire status that was created by the designation included in Georgetown's

copyright registration. Because we so conclude, the Screenplay does not qualify as a work for hire under section 101 of the Copyright Act.

In sum, Miller must be considered the author of the Screenplay, and the Act empowers him now to terminate the rights in the Screenplay that he earlier permitted the Companies. *See* 17 U.S.C. §§ 201, 203. We therefore affirm the District Court's award of summary judgment to Miller on this issue.

## II.  Statute of Limitations

As a last measure, the Companies argue that, even if Miller has authorship rights in the Screenplay, the Copyright Act's three-year statute of limitations precludes him from exercising the section 203 termination rights. The District Court rejected the contention. *Horror Inc.*, 335 F. Supp. 3d at 317. On *de novo* review, we reach the same conclusion.

The Copyright Act provides that all "civil actions" under its provisions must be brought "within three years after the claim accrued." 17 U.S.C. § 507(b). Generally, "[a]n ownership claim accrues only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of [his] right [in the work]." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 316 (2d Cir. 2013). The accrual rule is slightly different for authorship claims, however: "Although an alleged author is aware of his claim to ownership of the work from the moment of its creation, the author does not need to bring suit until there has been an express repudiation of that claim." *Id.* at 317. In other words, authorship claims "accrue when plain and express repudiation of [authorship] is communicated to the claimant, and are barred three years from the time of repudiation." *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996).

We have previously recognized several types of "express repudiation." *Gary Friedrich Enters., LLC*, 716 F.3d at 317. These included: "an express assertion of sole

39

authorship or ownership"; "when a book is published without the alleged co-author's name on it"; "when alleged co-authors are presented with a contract identifying the defendant as the sole owner and copyright holder"; and "when alleged co-owners learn they are entitled to royalties that they are not receiving." *Id.*

Here, the Companies identify three pieces of evidence in support of their position that they expressly repudiated Miller's authorship more than three years before Miller gave his termination notice. First, they point to a cover page that was attached to various drafts of the Screenplay. The Companies contend that the copyright notice on the cover page—which read, "© Copyright 1979 Sean S. Cunningham Films, Ltd. All Rights Reserved"—functioned as an express repudiation of Miller's authorship. Appellants' Br. at 58; App'x at 101.

It is not a novel observation that a copyright notice cannot serve as express repudiation of authorship because the notice, however worded, can be entirely consistent with another's authorship of a creative work. A copyright notice does not identify the author of a work; it merely lists "the name of the owner of the copyright." 17 U.S.C. § 401(b)(3); *see also Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004) ("The function of copyright notice is to warn off copiers, not to start the statute of limitations running."). Authorship is distinct from copyright ownership: an author of a work may, for example, transfer copyright ownership to another party, yet (as especially relevant here) still retain termination rights by virtue of his continuing status as the author. *Compare* 17 U.S.C. § 201(a) (providing that copyright in a work "vests initially in the author") *with id.* § 201(d) ("ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law); *see also id.* § 203(a) (conferring termination rights to "the author").

As a result, the copyright ownership notice that Cunningham placed on the Screenplay did not provide Miller with notice that Manny intended to repudiate his

authorial role and rights such as would be adequate to trigger the three-year statute of limitations. *See Gaiman*, 360 F.3d at 654 (holding that copyright notice did not repudiate claimants' interest in the work because the "copyright notice [was] not adverse to the [claimants'] copyrights and so [did] not put them on notice that their rights [were] being challenged"); *see also Gary Friedrich Enters., LLC*, 716 F.3d at 317-18 (observing that "the [copyright] notice would have only indicated that [defendant] held the rights to the initial term of copyright," and that the notice "would not have conclusively demonstrated that [defendant] was the author or otherwise had the right to register the renewal term"). Moreover, the language "A Screenplay by Victor Miller," which appeared on the title page that Cunningham prepared for the draft of the treatment and second draft of the screenplay, appears to attribute authorship of the Screenplay to Miller, further undermining the Companies' contention that the cover page expressly and plainly repudiated Miller's authorial rights. App'x at 101.

Next, the Companies point to a 2003 press interview given by Miller in which Miller stated that Cunningham and Scuderi "were the owners of this thing [the *Friday the 13th* franchise*]." Id.* at 281. As with the copyright notice, however, this statement is not evidence that Miller or any reasonable person would have understood the Companies to have made an express repudiation. Rather, it too is entirely consistent with Miller being the author of the Screenplay. As the District Court cogently explained:

> There is no dispute in this case that Manny and its successors have, for the last few decades, *owned* some rights in the screenplay. The question this case presents is whether such copyright interests vested initially in Miller, as the original author of the screenplay, with Manny obtaining from Miller either a transfer of ownership of the screenplay's copyright or a license thereto, or whether such copyright interests in the screenplay vested initially in Manny, as the original work for hire author of the screenplay prepared by Miller as Manny's employee. In the former scenario, Miller would be able to terminate his earlier transfer of the copyright interests to

41

> Manny and its successors pursuant to 17 U.S.C. § 203. Because both scenarios are consistent with Miller's prior acknowledgment of Manny's and related parties' ownership interests, Miller's generic statements acknowledging mere ownership interests are not sufficiently probative of any fact at issue in this case.

*Horror Inc.*, 335 F. Supp. 3d at 315 n.23.

Finally, the Companies point to Georgetown's copyright registration form, which identifies Georgetown as the Film's author and identifies the Film itself as a work for hire. App'x at 400-01. As this court recently held in *Wilson v. Dynatone Publishing Co.*, however, "mere registration of a copyright without more" does not suffice to trigger the accrual of an authorship claim. 892 F.3d 112, 119 (2d Cir. 2018) (explaining that "Plaintiffs did not have reasonable notice that Defendants had filed a [copyright] registration *in the capacity of employer for hire*."). To hold otherwise, the *Wilson* Court observed, would force authors "to maintain constant vigil over new registrations"; such a rule would "be vastly more burdensome than the obligations that a reasonably diligent plaintiff would undertake." *Id.* Here, the Companies have not put forward any evidence raising a reasonable inference that the Companies "expressly repudiated" Miller's authorial rights under the *Wilson* standard. *Id.* Accordingly, the terms of Georgetown's copyright registration, even when colored by the remarks mentioned above, do not satisfy the express-repudiation standard.

Thus, viewing the evidence in the light most favorable to the Companies, no reasonable factfinder could conclude that they expressly repudiated Miller's authorship of the Screenplay in a manner sufficient to trigger the start of the statute of limitations

period. Accordingly, we conclude without difficulty that Miller's authorship claim was timely.[22]

## CONCLUSION

We have considered the Companies' remaining arguments and find in them no basis for reversal. For the reasons set forth above, the judgment of the District Court is **AFFIRMED.**

---

[22] Because we conclude that the Copyright Act's three-year statute of limitations did not bar Miller's authorship claim, we do not address Miller's arguments providing alternative grounds for affirmance, namely that: (1) section 507(b)—the Copyright Act's statute-of-limitations provision—does not govern Miller's exercise of his termination right, a right that section 203(a)(3) provides must be exercised during a period of five years beginning at the end of thirty-five years from the date of execution of the grant, 17 U.S.C. § 203(a)(1), and, (2) regardless of the tolling of the statute of limitations, he could assert "that his termination notice was valid" as an affirmative defense to the Companies' claim for declaratory relief. Appellee' s Br. at 58.